[REMISSION OF FORFEITURE. PLEADING.]

## The UNITED STATES v. MORRIS, Marshal of the Southern District of New-York.

The Secretary of the Treasury has authority, under the Remission Act of the 3d of March, 1797, c. 361. [lvii.] to remit a forfeiture or penalty accruing under the revenue laws, at any time, before or after a final sentence of condemnation or judgment for the penalty, until the money is actually paid over to the Collector for distribution.

Such remission extends to the shares of the forfeiture or penalty to which the officers of the customs are entitled, as well as to the interest of the United States.

In a plea of justification by the Marshal, for not levying an execution, setting forth a remission by the Secretary of the Treasury, of the forfeiture or penalty on which the judgment was obtained, it is not necessary to set forth the statement of facts upon which the remission was founded.

ERROR to the Circuit Court for the Southern District of New-York.

This was an action brought against the defendant, in the Court below, as Marshal of the Southern District of New-York, for a misfeasance in neglecting to proceed on a *venditioni exponas* issued out of the District Court of the United States for the District of Maine, requiring him to sell the goods and chattels of Andrew Ogden, Abraham K. Smedes, and Thomas C. Butler, which he had levied upon by virtue of certain executions issued against them, in favour of the United States, on a judgment recovered in the said District Court of Maine, and which goods and chattels remained in his hands for want

of buyers, according to his return on said executions. The misconduct, or neglect of duty, alleged against the Marshal, was, that he did not sell the property so levied upon, according to the command of the writ, but delivered the same up to the defendants, discharged from the execution. The declaration stated the judgment to have been recovered in the September term of the Court, in the year 1817, for 22,361 dollars 75 cents, damages, and which, in part, to wit, in the sum of 11,180 dollars 87 cents, remained in full force, not reversed, paid off, or satisfied, to the plaintiffs, and that execution to that amount remains to be done. The *venditioni exponas*, as was alleged, was put into the hands of the Marshal on the 13th day of August, 1819.

The pleadings in the cause show, that Andrew Ogden, of the city of New-York, in or about the month of June, in the year 1813, imported into Portland, in the District of Maine, certain goods and merchandise in the brig Hollen, which vessel, as well as the goods, belonged to him. These goods, together with the brig, were thereupon seized as forfeited to the United States, on the ground that the goods had been imported in that vessel, in violation of the non-intercourse acts, then in existence. The goods and vessel were libelled in the District Court of Maine, on the 6th of July, 1813, and on the 19th of the same month were delivered up to Andrew Ogden, after having been regularly appraised, upon his having executed, together with Abraham K. Smedes, and Thomas C. Butler, a bond for their appraised

1825.

United States
v.
Morris.

value. The vessel and goods were, afterwards, on the 27th of May, 1817, condemned as forfeited to the use of the United States. And such proceedings were thereupon had, that, in the following September term of the Court, a judgment was entered upon the bond of appraisement for 22,361 dollars 75 cents, with costs.

The defendant, Morris, pleaded the general issue, and a special plea in justification, that the forfeitures had been remitted by the Secretary of the Treasury, setting out in *hæc verba*, two warrants of remission, which were duly served upon him before the return day of the *venditioni exponas*, and averring a compliance on the part of the defendants, with all the terms and conditions required by the warrants of remission. All which were duly set forth in the return on the *venditioni exponas*, before the commencement of the present suit.

To this special plea, a replication was filed, stating, in substance, that at the time of the forfeiture, seizure, and condemnation, of the brig Hollen, and the goods imported in her; and, also, at the time of their condemnation, and the entering up of the judgment on the bond for their appraised value, and of the issuing of the several writs of execution, and at the time of the making and issuing the said warrants of remission, and of the service thereof on the defendant, &c. Isaac Ilsley, and James C. Jewett, were the collector and surveyor of the port of Portland, and, as such, entitled to one half of the said forfeiture; and that the said several executions

were issued for their benefit, and solely to col-
lect the said sum of 11,180 dollars 87 cents, for
their own separate use, and that the defendant
had notice thereof when the said several writs of
execution were delivered to him to be executed;
setting out, also, two endorsements on the execu-
tion, one signed by the District Attorney of
Maine, notifying the defendant, that the execu-
tion was for the benefit of the said Collector and
Surveyor, and directing the Marshal to collect the
same by their order. The other was signed by
the Collector and Surveyor, requiring the Marshal
to collect the execution forthwith, and deposit
the money agreeably to the command of the
writ, and notifying him, that the property in the
execution was in them, and directing him to re-
ceive orders from them, and from no other per-
son whatsoever, in whatever related to the said
execution. And it was then averred, that the
present suit was for the purpose of enabling the
Collector and Surveyor to recover their damages
for the injury they had sustained by reason of the
misfeasance of the defendant, in the declaration
mentioned, and not for the benefit, use, or be-
hoof, of the said plaintiffs.

To this replication the defendant demurred
specially, and stated the following causes of de-
murrer : (1.) For that the replication is a depar-
ture from the declaration, in this, that the decla-
ration proceeds upon a cause of action in favour
of the United States ; whereas the replication
proceeds upon a cause of action in favour of the
said Ilsley and Jewett, &c. (2.) For that the

1825.

United States

v.

Morris.

replication discloses no lawful and sufficient authority for the said I. and J., to prosecute the said action against the said T. M., &c., and in the name of the United States. (3.) For that the declaration proceeds upon the ground, that the several writs of execution therein respectively mentioned, were issued upon a judgment obtained for the use of the United States, and, therefore, according to the act in such case made, &c., might lawfully run and be executed in any other State or territory of the United States, than the said District of Maine, in which the said judgment was obtained. Whereas the replication discloses the fact, that the said judgment was not obtained for the use of the said United States, but for the use and benefit of the said I. and J., and, therefore, could not run and be executed in any other State, &c. (4.) That the suit is prosecuted in the name of the United States, by an attorney, on record, other than the District Attorney of the United States for the Southern District of New-York.

A joinder in demurrer having been filed, judgment was given for the defendant in the Court below, and the cause brought by writ of error to this Court.

On the part of the plaintiff in error, it was contended, that the judgment ought to be reversed,

1. Because the Secretary of the Treasury had no power to remit the share of the forfeiture which belonged to the custom-house officers.

2. Because the action was rightly brought in the name of the United States, by an attorney of

the Court below, specially authorized to prosecute the suit by an order of one of the Judges of that Court.

3. Because the replication is not a departure from the declaration, proceeding upon a different cause of action from that stated in the declaration.

Mr. *Wheaton*, for the plaintiffs in error, stated the principal question in the cause to be, whether, after a definitive sentence of condemnation, in a revenue cause, the Secretary of the Treasury has a right, under the Remission Act of the 3d of March, 1797, c. 361. [lxvii.]*a* to remit the forfeiture so as

*a* Which provides, (s. 1.) " That wherever any person, or persons, who shall have incurred any fine, penalty, forfeiture, or disability, or shall have been interested in any vessel, goods, wares, or merchandise, which shall have been subject to any seizure, forfeiture, or disability, by force of any present or future law of the United States, for the laying, levying, or collecting, any duties or taxes, or by force of any present or future act, concerning the registering and recording of ships or vessels, or any act concerning the enrolling and licensing ships or vessels employed in the coasting trade or fisheries, and for regulating the same, shall prefer his petition to the Judge of the District in which such fine, penalty, forfeiture, or disability shall have accrued, truly and particularly setting forth the circumstances of his case; first causing reasonable notice to be given to the person or persons claiming such fine, penalty, or forfeiture, and to the Attorney of the United States for such District, that each may have an opportunity of showing cause against the remission or mitigation thereof; and shall cause the facts which shall appear upon such inquiry, to be stated and annexed to the petition, and direct their transmission to the Secretary of the Treasury of the United States, who shall thereupon have power to mitigate or remit such fine, forfeiture, or penalty, or remove such disability, or any part thereof, if in his opinion the

to affect the right of the officers of the customs, under the Collection Act of 1799, c. 128. [cxxviii.] ss. 89. and 91.,[a] to a moiety of the fines, penal-

same shall have been incurred without wilful negligence, or any intention of fraud in the person or, persons incurring the same; and to direct the prosecution, if any shall have been instituted for the recovery thereof, to cease and be discontinued, upon such terms or conditions as he may deem reasonable and just." (S. 3.) " That nothing herein contained shall be construed to affect the right or claim of any person to that part of any fine, penalty, or forfeiture, incurred by the breach of any of the laws aforesaid, which such person shall or may be entitled to, by virtue of the said laws, in cases where a prosecution has been commenced, or information has been given before the passing of this act, or any other act relative to the mitigation, or remission of such fines, penalties, or forfeitures; the amount of which right and claim shall be assessed and valued by the proper Judge or Court in a summary way."

a Which provides, (s. 89.) " That all penalties accruing by any breach of this act, shall be sued for and recovered, with costs of suit, in the name of the United States of America, in any Court competent to try the same; and the trial of any fact which may be put in issue, shall be within the judicial District in which any such penalty shall have accrued; and the Collector within whose District the seizure shall have been made, or forfeiture incurred, is hereby enjoined to cause suits for the same to be commenced without delay, and prosecuted to effect; and is, moreover, authorized to receive from the Court, within which such trial is had, or from the proper officer thereof, the sum or sums so recovered, after deducting proper charges, to be allowed by the said Court; and on receipt thereof the said Collector shall pay and distribute the same, without delay, according to law," &c. (s. 91.) " That all fines, penalties and forfeitures, recovered by virtue of this act, and not otherwise appropriated, shall, after deducting all proper costs and charges, be disposed of as follows: one moiety shall be for the use of the United States, and be paid into the Treasury thereof by the Collector receiving the same; the other moiety shall be divided between, and paid in equal proportions to, the Collector

ties, and forfeitures, recovered under the act.

He insisted, that the right of the Collector, &c. accruing by the seizure, was consummated by the final sentence of condemnation, and became an absolutely vested right, which could not be devested by the remission after such sentence. This had been expressly determined in the Circuit Court for the First Circuit;[a] and though the case had not hitherto been presented to this Court, there were other analogous cases which settled the doctrine, that, as between the representatives of a deceased Collector, and his successor in office, or as between a removed Collector and such successor, the share of the forfeiture to which he is entitled attaches, and is consummated by the sentence of condemnation.[b] This went upon the principle, that it became an absolutely vested right, by relation back to the time of seizure. If it were an absolutely vested right, it must be vested as against the government. It is not vested, even as against the government, at the time of the seizure. That only gives an inchoate right, which may never become absolute for want of a condemnation, or may be intercepted by a remission before condemnation. The

and Naval Officer of the District and Surveyor of the port, wherein the same shall have been incurred, or to such of the said officers as there may be in the said District; and in districts where only one of the aforesaid officers shall have been established, the said moiety shall be given to such officer," &c.

*a* The Margaretta, 1 *Gallis. Rep.* 515. 522. The Hollen, 1 *Mason's Rep.* 431.

*b* Jones v. Shore, 1 *Wheat. Rep.* 462. Van Ness v. Buel, 4 *Wheat. Rep.* 74.

forfeiture has, for certain purposes, relation back to the commission of the offence. As between the offender and all persons claiming as purchasers of the property, and the government, the forfeiture attaches at the moment of *delictum*.[a] But this proceeds from the necessary strictness of all fiscal regulations, and does not prevent a remission before condemnation. The *delictum* does, indeed, devest the proprietary interest from the owner, so as to overreach the claims of subsequent purchasers; but it does not, therefore, follow, that the share to which the officers of the customs may become entitled, vests in them *eo instanti*. Their title may never vest, by reason of three contingencies : (1.) There may be no seizure. (2.) There may be a remission after the offence, and before condemnation. (3.) There may be no condemnation. If there be no seizure, of course no title vests. If there be a remission before condemnation, as no title has yet vested except against subsequent purchasers, it purges the offence entirely, by relation back to the *delictum*. If there be no condemnation, the inchoate title is never ripened into maturity. But if there be a remission after condemnation, the rights of the seizing officers have become absolute, and the remission purges the offence (if it has any effect at all) only so far as the government is concerned.

This would appear from the plain reading of the Collection Act of 1799, c. 128. [cxxviii.]

---

*a* 8 *Cranch's Rep.* 398. 417.

ss. 89, 90, 91. which directs the Collector to prose-
cute for breaches of the revenue laws, and to re-
ceive the sums recovered, and to pay and distri-
bute the same among the different persons en-
titled. It must be admitted, on all hands, that
the right must absolutely vest at some period.
The Court have already rejected the notion that
it does not vest until the actual receipt and pay-
ment over of the money.[a] There could, there-
fore, be no other epoch but that of the sentence
of condemnation, which, if definitive, or unap-
pealed from, fixes and ascertains the rights of all
parties. Admitting, for the sake of the argu-
ment, that the government may afterwards remit,
so far as its own rights are exclusively concern-
ed; it cannot certainly be concluded, from the
terms of the Remission Act, that the government
intended to revoke its bounty, conferred abso-
lutely upon its officers by a solemn statute for
great purposes of public policy. It is immate-
rial what the Secretary of the Treasury intended
to do. The question is, what was he authorized
to do by the law under which he acted.

All the analogies of the common law would be
found to repel the idea that the remission could
devest the rights which had become ascertained
and fixed by the sentence of condemnation. Par-
don and remission are synonymous terms, and
their legal effect upon the rights of parties must
be the same. " Pardon" is defined to be " a
work of mercy, whereby the king forgiveth any

---

[a] Jones v. Shore. 1 *Wheat. Rep.* 470.

1825.

United States
v.
Morris.

offence, &c. *right, title, debt, or duty.*[a] The power which is given to the President by the constitution, of granting pardons for offences may, or may not, extend to revenue cases; but whether the pardon is granted by the President, or by his minister, is immaterial. It is still the act of the government, and it can have no greater effect in the one case than in the other. It is laid down that a pardon does not discharge the thing in which the subject has a property or interest; as if a suit be in the Spiritual Court for tithes, a legacy contract, or matrimony, &c.[b] or for dilapidation.[c] So, if an incumbent accepts a plurality, the interest of the patron to present is not discharged by a general pardon.[d] A penalty, upon a conviction for deer stealing, is not discharged by a pardon; for it is a forfeiture to the party grieved. The king cannot, by his pardon, discharge an action commenced *qui tam* upon a penal statute, *except for the king's moiety or part.*[f] Nor penalties to be divided between the informer and the poor of the parish.[g] So a pardon does not discharge a thing *consequent or incident* in which the subject has an interest vested in him; as costs taxed in the Spiritual Court, a pardon of the offence does not discharge the costs.[h] And this, though the party appeals after the taxation of costs, so that the sentence is suspended by the appeal. So, if the party appeals

a 3 *Inst.* 233.

b 5 *Co.* 51. *a.*

c 3 *Mod. Rep* 56.

d *Cro. Car.* 357. 358.

e 1 *Salk. Rep.* 233, 234.

f 3 *Inst.* 238.

g *Str. Rep.* 1272.

h 5 *Co.* 51. *b.* *Cro. Jac.* 159. *Cro. Car.* 199.

a 5 *Co. Lit.* 51. *b.*

after costs taxed, and then the pardon comes, and upon the appeal the former sentence is annulled, and costs given to the appellant; these costs are not discharged by the pardon: for the costs being taxed in the original suit, the party had a right of appeal, which was not taken away by the pardon; and, consequently, has a right to the costs.[a]  So, on a proceeding *in rem*, in the Exchequer, the crown's share only of a forfeiture is pardoned, by an act of general pardon, but not the informer's on an information previously filed.[b] And in prize proceedings, the condemnation is held to vest the right in the captors so absolutely, that the government cannot release.  Thus, in the case of the *Elsebe*, (one of the famous Swedish convoys)  Sir W. Scott determined, that the crown might interpose to release the captured vessels *before*, but not *after*, a final adjudication.[c]

As to the technical questions which had been raised by the special demurrer upon the pleadings, they were all involved in the question upon the merits.  If the remission was void as to the custom-house officers, they had a right to sue in the name of the United States; or, rather, the latter are suing in their own name, to give effect to their own bounty granted to those officers, who are prosecutors from the beginning in the name of the United States.  They are not only privies, but parties, and are concluded by a sen-

1825.

United States
v.
Morris.

a *Cro. Car.* 47.          b *Parker,* 280.
c 5 *Rob.* 173.

United States
v.
Morris.

tence of acquittal as well as of condemnation." But they may also be considered as the assignees of the United States, and then the question whether they are to sue in their own name, or in that of the United States, will depend upon the forms of proceeding in analogous cases. By the civil law, on the cession of a debt, the assignor impliedly ceded to the assignee all his rights of action as incidental to the cession. The assignee became what was called *procurator in rem suam*, and sued in the name of his assignor. So, in England, and in this country, it has long since been settled, that the assignee of a chose in action may sue in the name of the assignor; who has no right to interfere with the suit.[b] By the ancient common law, the king could assign a chose in action, though a subject could not. But the assignee of the king took it with all the high prerogative remedies. Thus, it is laid down, that the king's grantee may sue an obligation, &c. granted to him, in his own name, or may prosecute in the king's name; " for the grant of the statute, or debt, is a warrant to him to prosecute process in the king's name."[c] Thus, where a debt due to an outlawed person was granted by the king; held, that the grantee might levy it in his own name, or, by extent, in the king's name. "although he hath not any words in his

a  Hoyt v. Gelston, 3 *Wheat. Rep.* 319.
b  1 *Johns. Cas.* 411.  2 *Johns. Cas.* 121.  3 *Johns. Rep.* 425.  Bottomley v. Brooke, 2 *Bl. Rep.* 1271.  1 *Wheat. Rep.* 233.  1 *Term Rep.* 619. 621, 622.
c  *Cro. Jac.* 82.

grant to sue it in the name of the king, as is usual in such cases."[a]

As to the alleged departure in pleading, which is relied on as one of the causes of demurrer, the objection is, that the replication sets up a cause of action in the custom-house officers, whilst the declaration proceeds on a cause of action for the United States. The answer is, that the suit being here brought in the name of the United States, whose duty and interest it is to prosecute for the benefit of the officers, (who are their grantees,) notwithstanding the remission, the cause of action stated in the replication is just as much in favour of the United States as that set up in the declaration. How, then, stand the pleadings? (1.) The declaration setting up a cause of action in favour of the United States. (2.) A plea of remission by the United States. (3.) A replication, admitting the fact of remission, and affirming the cause of action in favour of the United States, as set up in the declaration, *with a new circumstance*, viz. a right of third persons, which invalidates the remission so far as they are concerned. This new matter is asserted, not by the officers, but by the United States themselves, who sue precisely as if the parties had not performed the conditions on which the remission was granted, and it had become totally void. It was not necessary that this new matter should have been stated in the

---

a *Cro. Jac.* 179, 180. *Com. Dig.* tit. Assignment, (D.)

declaration. In declaring, it is only necessary to set out enough to maintain the action. In an action for not executing a writ of execution, it is sufficient to set out the judgment, execution, and facts of neglect or misfeasance. Even stating the judgment is merely inducement. It is sufficient to state concisely the circumstances which give rise to the defendant's particular duty or liability.[a] The remission was a matter of defence which it was incumbent on the defendant to set forth. Successive pleadings are designed for this very purpose. The office of the declaration is to set forth the cause of action merely, of the plea to avoid it, and of the replication to avoid the plea. Thus, in debt on bond for the performance of covenants, the plaintiff declared for the penalty. The defendant craved oyer, and pleaded general performance. The plaintiff replied, setting forth particular breaches, and it was held good.[b] The declaration in the present case pursues the most approved forms, and with more circumstantiality than usual.[c] Departure is where the plea contains subsequent matter, which does not maintain or fortify the matter in the declaration.[d] But here it does maintain it, and, at the same time, avoids the bar. The bar is remission; the replication shows, that it is no answer to the declara-

a  1 Chitty's Plead. 369.
b  Post Master General v. Cochran, 2 Johns. Rep. 413.
c  See 2 Chitty's Plead. 203—206.
d  Co. Litt. 304. a.

tion. In *Winch* v. *Keeley*,[a] in assumpsit, defendant pleaded, that plaintiff had become a bankrupt, and assigned all his effects, under the statute, to his legal assignees ; plaintiff replied, that the suit was brought by him for the use of another party, to whom he had transferred the debt before the bankruptcy. The replication was held good, and the objection of departure was not even mentioned at the bar.

On the part of the defendant, it was insisted, that the judgment ought to be affirmed, for the following reasons :

1. Because the Secretary of the Treasury had a right to remit the forfeiture in question, notwithstanding the judgment of condemnation previously rendered, as stated in the pleadings.

2. Because, the whole case, on the part of the Collector and Surveyor of Portland, proceeds on the ground, that the remission by the Secretary is binding upon the United States, and discharges their moiety of the forfeiture ; but has not that effect on the other moiety claimed by them ; thus giving a construction to the remission, inconsistent with its own terms, and the act under which it was granted. According to that act, the remission must be valid to the whole extent of the power exercised under it, or not at all ; as it is, admitted, therefore, to be good in part, it follows that it is good for the whole.

3. Because such a remission is not like a pardon, nor is it to be governed by the same rules ;

[a] 1 *Term Rev.* 619.

but is equivalent to the judgment or decree of a competent tribunal, that no forfeiture should be enforced, inasmuch as it was without wilful negligence, or any intention of fraud, in the person or persons incurring the same.

4. Because, as far at least as it relates to the act of Congress, vesting in the Secretary of the Treasury the remitting power, as therein mentioned, the custom-house officers have no vested rights in any forfeiture, until not only condemnation, but the receipt of the money produced by a sale of the forfeiture, or collection of the bond substituted for it, before which time the Secretary has full power to remit; and, having exercised it in this case, the Collector and Surveyor of Portland are equally bound by it as the United States.

5. Because, if the said Collector and Surveyor of Portland had any vested rights in the forfeiture in question, notwithstanding the remission, then they ought to have enforced them by an action in their own name, and not in that of the United States.

6. Because, the condemnation of the brig and goods being to the use of the United States, and the recovery in the bond being also in the name of the United States, they became trustees for the Collector and Surveyor of Portland, for whatever rights or interest they had therein; and these, whatever they were, were discharged by the remission of the Secretary, inasmuch as the release of a trustee is, at

law, a bar of the rights or interest of his *cestui* 1825.
*que trust,* and especially in a case where fraud
is neither charged nor pretended.

7. Because, this being an action to recover
damages for a misfeasance, if the United States
themselves could sustain it, yet, it being, in its
nature, incapable of assignment, they could not
transfer to the said Collector and Surveyor such
right of action, and authorize its prosecution in
their name ; much less can it be prosecuted with-
out any such assignment or authority.

8. Because, if the United States could them-
selves sustain such an action, the said Collector
and Surveyor would be entitled to no part of the
damages recovered ; for such damages would
not be the forfeiture, nor the proceeds of the
bond which was substituted for it ; to a share of
which only they are by law entitled. Of course,
therefore, they cannot sustain the present action
to recover damages for their own private benefit,
in the name of the United States, which, if re-
covered by the United States, they would be en-
titled to no share of.

Mr. *Emmett* and Mr. *D. B. Ogden,* for the
defendant, stated, upon the first point, that it was
remarkable, and might be useful for interpreting
the law, that the question as to the power of the
Secretary to remit, after sentence, was never
raised until subsequently to the judgment of this
Court in *Jones* v. *Shore,*[a] and more especially

a 1 *Wheat. Rep.* 462.

United States
v.
Morris.

until after what fell from Story, J. in the *Marga-retta.*[a] That no such doubt was conceived to exist at the bar before the case of *Jones* v. *Shore*, appears from the arguments of all the counsel in that case, which admit, that the right was not so vested as not to be defeated by a remission. An expression there attributed to Mr. Pinkney ' as to the President's power of pardoning, leads to an examination of the distinction between this power of remission and the pardoning power. The power of pardoning is a prerogative given to the President by the constitution, analogous to that exercised by the British, and other sovereigns. It is an act of grace and mercy, founded on the fact of guilt and crime, but exercised from other considerations than those which govern a remission by the treasury. It is laid down, that " the king, by his prerogative, may grant his pardon to all offenders attainted or convicted of a crime, *where he has hope of their amendment*."[b] The remission proceeds on the ground of moral innocence, and is to be only a consequence of it. The Secretary of the Treasury has no power whatever, except where, in his opinion, from the judicial statement of facts, the forfeiture " shall have been incurred without wilful negligence, or any intention of fraud in the person or persons incurring the same." A pardon being an act of grace and mercy to an acknowledged criminal, it is but just

a 2 *Gallis. Rep.* 516.        b 1 *Wheat. Rep.* 462.
c *Comyn's Dig. Pardon,* (A.)

that it should not disturb the rights of others, founded on the fact of that guilt, and their industry in detecting it; but where the remission is founded on moral innocence, the justice of the case is the other way. In this respect, there ought to be no difference whether a condemnation was had or not; for, although a sentence of condemnation may establish a violation of the letter of the revenue laws, the remission proceeds on the ground, that it establishes no guilt, and the petition for the remission must admit all the facts on which conviction could be founded. The remission is intended to be, and is, in fact, a judicial decision. It is the policy of the revenue laws to make certain *acts* subject to forfeiture and penalties. It adopts this course, in order to relieve the government from the *onus* of proving, that those acts were coupled with a criminal intent; and to oblige the party suffering to prove the innocence of his mind, by such evidence as would satisfy the proper officer of the government itself. In analogy to the jurisdiction of a Court of equity to take cognisance of a judgment at law, and relieve against it on principles which the Courts of law could not have taken into consideration, the Secretary of the Treasury is empowered to administer equitable relief, on principles which the revenue Courts could not apply; but which go to the entire destruction of all guilt, and ought, therefore, to go to the entire remission of all punishment. The preliminary proceedings are all judicial, by petition to the District Judge, and by examinations before him

and, like an analogous suit in equity, all parties interested are brought before the Court to assert their rights, and contest the justice of the application. The officers of the customs, having notice, and the liberty of contesting the matter, are parties to the suit or application, and can no more complain that they are deprived of vested rights, than they could where a Court of equity decreed a perpetual injunction on a judgment at law.

The statute, having thus provided for making all persons interested parties to the suit, uses the most general language possible to cover the entire remission of the forfeiture. The prayer of the petition extends to the remission of the whole, and the power given to the Secretary is to remit " *such* fines," &c. The proviso in the 3d section shows the extent to which it was intended to protect vested interests, or to consider them as vested, viz. where a prosecution had been commenced, or information given, before the passing of the act. Every information, seizure, or prosecution, subsequent to the passing of the act, was followed up, subject to the provisions of that act. It formed a limitation upon the extent of vesting the interests of the prosecutors, or, to use the expression of one of the counsel, in *Jones* v. *Shore,*[a] " it is a condition originally attached by the law;" and attached, whether the interest became originally vested by the seizure, the condemnation, or the recovery, and receipt of the money.

a 1 *Wheat. Rep.* 467.

To what extent is the vesting? It is decided <span>1825.</span> in *Van Ness* v. *Buel*,[a] that the Collector acquires <span>United States</span> an *inchoate* right by the seizure, which, by the <span>v.</span> subsequent decree of condemnation, gives him <span>Morris.</span> an absolute vested title to his share in the forfeiture; and it is also determined, in *Jones* v. *Shore*,[b] that the right to share in the forfeitures and penalties is given to the Collector who made the seizure, and not to him in office on the receipt of the money. These adjudications were as between officers themselves, and not between an officer and the owner of the thing seized. But they establish the principle, that the right made absolute by condemnation was that, and *only that*, which had become inchoate by seizure. That inchoate right was, under the statute, subject to be destroyed by remission according to its provisions, and therefore that made absolute must be subject to the same provisions.

But the vesting of the right, as laid down in the case of the *Margaretta*,[c] does not take place before a *final* judgment or sentence; and the same epoch is assigned in the case of the *Elsebe*,[d] for the vesting of prize interests in cases of capture. Now, prize Courts can take notice of all equitable considerations, but a revenue Court cannot. Notwithstanding condemnation, then, it remains to be inquired, whether there was any criminal intent. If innocence be alleged, and the proper proceedings founded on it be insti-

a 4 *Wheat. Rep.* 74.  b 1 *Wheat. Rep.* 467.
c 2 *Gallis. Rep.* 522.  d 5 *Rob. Rep.* 155. *Am. ed.*

1825.

United States
v.
Morris.

tuted, until those proceedings are decided upon, there is no final adjudication, within the spirit and meaning of the act.

Another consideration shows that the remission must operate to extinguish the rights of the officers of the customs. They could maintain no action for the forfeiture as in their own names. The forfeiting party has nothing to do with *them:* he forfeits only to the United States, and it is only as between the United States and the officers, that the latter have any claim. In this respect there is a material difference between our act and the British revenue laws. By the British statute, one half is forfeited to the use of the crown, and the other to the use of the informer. In the Exchequer, the form of proceeding is to adjudge a moiety of the forfeiture to the seizors, or informer, by the sentence itself, and it becomes a vested right in them, by relation back to the filing the information.[a] But in this country, the utmost that can be said is, that the United States are, *pro tanto,* trustees for them; but as to the forfeiting party, the government is the only legal *actor.* There must be a right of releasing some where. A release by the officers of the customs would not prevent the United States from recovering the whole penalty. Thus, in debt on a single bond made to A., to the use of him and B., the defendant pleaded a release made to him by B.; on which the plaintiff demurred; and without difficulty, it was ad-

---

*a* Weddel v. Thurlow, *Parker.* 280.

1825.

United States
v.
Morris.

judged for the plaintiff : for B. is no party to the deed, and therefore can neither sue nor release it. But it is an equitable trust for him, and suable in the Chancery, if A. will not let him have part of the money : and the book of Edw. III. cited, that he might release in such case, was denied to be law.[a]  Since there must be a power of releasing somewhere, and the officers could not do it, the power must reside in the United States, and the remission is such a release.[b]

Cases have been cited on the other side, in which Courts of law have taken notice of equitable interests, and have permitted them to be pleaded or replied, so as to protect them. All these cases proceed on the ground of fraud and collusion, which cannot be charged here. As to *Bottomley* v. *Brook*, and *Rudge* v. *Birch*,[c] they are said by Mr. Maryatt, in *Schooley* v. *Mears*,[d] to have been overruled in the Exchequer, in the case of *Lane* v. *Chandler* : and in *Wake* v. *Tinkler*, Lord Ellenborough says, " I am much more inclined to restrain than to extend the doctrine of these cases." And Bailey, J. says, " we have nothing to do in this case with any other than legal rights." So in *Bakerman* v. *Radenius*,[e] Mr. Erskine (arguendo) states a case before Lord Mansfield, where an action was brought in the name of a nominal plaintiff by persons benefi-

a Offly v. Warde, 1 *Lev.* 235. S. C. 2 *Keb.* 333.

b Bayley v. Lloyd, 7 *Mod. Rep.* 250.

c Cited in 1 *Term Rep.* 621, 622.

d 7 *East. Rep.* 153.

e 7 *Term Rep.* 662.

cially interested, for whom he was a trustee. At the trial, the defendant produced a release from the plaintiff, which Lord Mansfield held to be conclusive; but said the Court of Chancery, upon application, would make the trustee pay the principal, the debt, if well founded, and the costs of suit. And Lawrence, J. cites a case from *Salkeld,*[a] where Lord Holt said, that if the plaintiff in ejectment, who is considered only as a trustee for the lessor, released the action, he might be committed for a contempt of the Court: " but he did not say the release would not defeat the action." So, in *Paine* v. *Rogers,*[b] where the tenant, a nominal plaintiff, having given a release to the plaintiff, the Court, on application of the landlord, ordered it to be given up; clearly, because if used it would defeat the action. And in *Legh* v. *Legh,* the obligor of a bond, after notice of its being assigned, took a release from the obligee, and pleaded it to an action brought by the assignee, in the name of the obligee. The Court, on motion, set the plea aside, Eyre, C. J. saying, " the only question is, whether the assignee must not seek relief in a Court of equity." Clearly showing, as the whole case does, that the plea could not be replied to at law.

But why should the custom-house officers be entitled to maintain this action in the name of the United States, notwithstanding their release, and having no possible interest in the result?

*a Anony, Salk: 260.     b Dougl. 407.*

Why should they have the benefit of not being liable to costs for a false action? They are not assignees of the United States, if that would protect them. There can be no assignment of a test. The injury by the Marshal's return is directly to themselves, and the United States have barred themselves from regarding it as an injury to them by the remission. The right to sue in the name of another only existed where the action would not lie in the name of the party actually interested. But, in every case where the unlawful act of one person does an injury to another, an action on the case lies for the injury. Can the United States, who are not injured, sustain this action? If they could, is such a right of action assignable? Here, however, is no actual assignment; and it can only be considered as analogous to the assignment of a chose in action. But how can the real plaintiffs entitle themselves to the damages recovered in the name of the United States, without such assignment? The law only gives them half the forfeiture or proceeds. How, then, can they, notwithstanding the release or remission by the United States, recover, in their name, damages which they are not legally entitled to participate in? and do so for their own benefit, when, if they have sustained damages, they may sue in their own name?

And this brings us to consider some of the special causes of demurrer. The replication is a departure from the declaration, not only by not bringing forward matter pursuant to it, and fortifying it, but by bringing forward matter showing

1825.

United States
v.
Morris.

no right of action in the plaintiffs, and showing, that if it exists any where, it exists in third persons ; and that this matter was known, and might be made available, before action brought. *Departure* is defined to be, " when the second plea containeth matter not pursuant to his former, and which fortifieth not the same, and, therefore, it is called *decessus*, because he departeth from his former plea."[a] Thus, where the defendant pleads in bar a lease for fifty years made by a corporation ; plaintiff replies, that it was made while a former lease was in existence, and shows the statute 21 *Hen.* VIII., and that the lease for fifty years was void ; not setting forth the proviso making such leases good for twenty-one years. Defendant, in his rejoinder, pleads the proviso of the statute 21 *Hen.* VIII., which makes such leases good for twenty-one years. Held, that this pleading of the proviso was a departure, because it neither goes with, nor enforces the bar before.[b] So, in a *præcipe quod reddat*, the tenant pleads, that the land was devised to him, and the plaintiff replies, that the devisor was an infant ; to this the defendant says, that, by the custom, infants may devise ; and, *per Curiam*, this is a departure, for he ought to have pleaded the special matter first.[c] So, in *Doctr. Plac.* 124. per Keble, *nota*, where general matter is pleaded, and where the special matter might have been

a  *Co. Litt.* 304. *a.  Doctr. Plac.* tit. *Departure*, (119.)
b  Fulmarston v. Stuard, *Dyer*, 102. *b.* 103. *a.*
c  *Doctr. Plac.* 123.   37 *H.* VI. 5.

pleaded at the commencement, the party, afterwards, shall not maintain the general matter with the special matters. And if the defendant justifies by distress for rent, and the plaintiff replies, that he used and sold them, to which the defendant rejoins, that he sold the distress pursuant to the statute 2 *W. & M.*, it will be a departure; for it should have been alleged so at first.[a] Defendant, in a plea, justified taking cattle *damage feasant*, and afterwards rejoined, that they were taken *surcharging the common;* held to be a departure; and one of the reasons was, that the surcharge might have been pleaded first, because the defendant then knew the plaintiff's right.[b] So, when a man, in his former plea, pleadeth an estate made by the common law, in the second plea, regularly, he shall not make it good by an act of parliament. So, when, in his former plea, he entitleth himself, generally, by the common law, in his second plea he shall not enable himself by a custom, but should have pleaded it at first.[c]

As to the third cause of demurrer, the statute only enables the issuing of a writ of execution to another District, upon judgments " obtained for the use of the United States." The present judgment was obtained in their name; but for the use of other parties. It is contended, that if the judgment was for the use of the United States, the execution need not be so. But the privilege

1825.

United States
v.
Morris.

a *Com. Dig. Pleader*, (s. 8.)
b Ellis v. Rowles, *Wilkes*, 638.
c *Co. Litt.* 304. a.

obviously attaches to the execution, and not to the judgment. It was for the benefit of the government, and was not intended to be communicable to citizens in cases where the United States have no interest. All the rules for construing statutes will bear out this interpretation.[a]

Mr. *Webster*, for the plaintiffs, in reply, insisted, that the authority to sue in the name of the United States could not be disputed by the defendant in this Court. The government was here represented by the Attorney General, and if he did not interfere with the suit, it might well be maintained. It was novel doctrine, that an appearance by a wrong attorney was a ground of demurrer. If it had been intended to take advantage of that objection, a summary application should have been made to the Court below, by whom the attorney on the record had been appointed to prosecute this suit, the District Attorney having refused to prosecute it. The discretionary power exercised by the Court below in this instance, was essential to the administration of justice, whenever the District Attorney refuses to act, or is interested, or in case of his death. But, even if this Court should be of opinion, that the order made in the present case was irregular, it would not, on that account, give judgment against the sufficiency of the plaintiff's replication as pleaded. It would merely direct the pleadings to be amended by inserting the name

[a] *Bac. Abr.* tit. *Statute. J. 5. Plowd.* 18.

of the District Attorney in the place of the present attorney on the record. The plaintiff's declaration is admitted to be good, and it is unnecessary to consider the replication, since the plea contains the first fault (if any) in the pleadings. It cannot be pretended that it is a good plea, because the plaintiff has declared by a wrong attorney. If this judgment be affirmed, it is a perpetual bar as against the United States, and all others interested. While the cause is allowed to stand on the calendar, the rights of the parties, as stated in the pleadings, must alone be regarded. But the officers of the customs have a right to use the name of the United States. The cases cited in the opening sufficiently show it. Wherever the subject has an interest in a prosecution in which the king's name is necessary as a formal party, the subject has a legal right to use it. All cases of information, not *ex officio*, are of this sort, such as those by the Master of the Crown Office, in *quo warranto*, of intrusion to office, &c. The prerogative of the supreme magistrate is held, not for purposes of ostentation, but for the substantial benefit of society, and its aid may be invoked as often as necessity requires it.

The plea is bad, because the Marshal, who is a mere ministerial officer, was not a competent judge of the validity or effect of the remission. He is the officer of the Court, and not of the treasury. He is to collect the money, and bring it into Court. When it is received in the registry, distribution is to be made of it according to

law; or if the forfeiture has been remitted, the conditions of the remission are to be complied with under the directions of the Court. If the Marshal had levied the money upon the execution, and no remission had been obtained, he could only be compelled to pay it over by a motion to compel him to return the process. If the remission had been unconditional, and could devest the share of the custom-house officers, he had nothing to do with carrying it into effect. It is by the Court only that the rights of the parties are to be ascertained, and their respective claims to be satisfied.

The plea is also bad, because it does not set forth, with proper averments, the facts and circumstances stated in the petition to the Secretary of the Treasury, upon which the remission of the forfeiture was granted. It is an inflexible rule of pleading, that whenever a justification is set up under a special or limited authority, every thing should be set forth to show the case to be within the protection of the authority relied on. The statement of facts on which the remission was grounded, is essential to be known, in order to see whether the Secretary of the Treasury, who also acts merely as a ministerial officer, has pursued his authority. It has, indeed, been argued, that the Secretary acts judicially in those cases, and that his decision is an adjudication binding on all the world, and especially on the officers of the customs, who are both parties and privies. But, how can that be a judicial power, which is merely of executive discretion? The

Secretary *may* remit under the statute, whenever it is proved to his satisfaction that the offence was committed " without wilful negligence, or an intention of fraud;" but he is *not bound* to remit even in case of innocence ever so clearly proved. All judicial power, under the constitution, is vested in one Supreme Court, and such inferior tribunals as Congress shall establish. How, then, can any portion of that power be vested in the treasury department, or in any other executive department?

The plea is bad, because it alleges the remission after a final sentence of condemnation, and a summary judgment upon the appraisement bond. The Remission Act of Congress was evidently copied from the British statute of the 27th Geo. III. c. 27.; and under that statute the Commissioners of the Customs have never exercised the power of remitting a forfeiture after judgment.[a] This defect of authority having been found, in some respects, inconvenient, the power of remitting after judgment was expressly given (not to the Commissioners of the Customs, but to a higher authority,) the Lords of the Treasury, by the 54th of Geo. III. c. 171. When it is said, that the rights of the custom-house officers are vested from the time of the judgment or sentence, it is not meant that they are vested independent of the act of Congress, but under the act, and according to the act. If the law authorizes a remission after judgment, it is idle to speak of

1825.

United States
v.
Morris.

_____
a. *Chitty's Crim. Law*, 798.

1825.

United States
v.
Morris.

rights being vested by the judgment. The question is, what does the act mean? And it is contended, that it limits the power to cases before condemnation. Every clause and phrase of the act is applicable, and alone applicable, to such cases. The persons entitled to the benefit of the act, are those who " *shall have incurred* any fine, forfeiture, or disability, or shall have been interested in any vessel, goods, wares, or merchandise, *which shall have been subject to* any seizure, *forfeiture*, or disability," &c. This cannot refer to things already forfeited. Goods forfeited and condemned, are not *subject* to forfeiture ; they are actually forfeited. So, the words, " *incurred any forfeiture.*" No man *incurs* a forfeiture by a judgment against him. It is the offence by which the forfeiture is incurred. So, also, the summary inquiry which is to be made by the District Judge, into the facts and circumstances of the case, shows, that the law supposes that no trial had yet been had. It would be an absurd provision, upon any other supposition. The act authorizes the Secretary to direct the prosecution, if any shall have been instituted, for the recovery of the forfeiture, to cease, and be discontinued. It supposes a prosecution either pending, or not yet brought. The prosecution cannot be said to be pending, in a general sense, after judgment. There is not a single expression in the act applicable to a judgment. But here are two successive judgments, one against the goods, and the other against the claimants, upon the appraisement bond. How can the remission dis-

charge this second judgment? Why was not the
remission shown when the application was made
for that judgment, so as to prevent its being en-
tered? There is nothing in the act to authorize
the remission of a judgment. The subjects to
be remitted are, " fines, penalties, forfeitures,
and disabilities." Besides, the phraseology ap-
plicable to judgments would be, *released,* or va-
cated; not remitted or mitigated. There must be
some limit in point of time, and in the order of
the proceedings, to the exercise of this power of
remission. If the rights of all parties are not
fixed and ascertained by the judgment, it will be
difficult to discover when they are consummated.
The receipt of the money by the officers may
change the possession, but it cannot alter the
right. That idea is expressly rejected by the
Court in *Jones* v. *Shore.*[a]

The argument on the other side, that there
must be a power of releasing somewhere, and
since the Custom House officers cannot do it, the
power must reside in the United States, and may,
therefore, be exercised by the Secretary of the
Treasury, is founded upon an entire misappre-
hension of the distinct powers of the different
branches of the government. There is no au-
thority given by law to any department or officer
of the executive government to release a debt
due by judgment. The Secretary of the Trea-
sury may remit a forfeiture or penalty before
judgment, or may discharge the debtor as to his

1825.

United States
v.
Morris.

a 1 *Wheat. Rep.* 470.

1825.  person, but nothing short of the legislative power
United States  of Congress, specially exercised, can discharge
v.  the debt. The usual course of the Treasury has
Morris.  been, to refuse to remit after judgment, and to
refer to the President for the exercise of the par-
doning power. It may well be doubted, whether
that power extends, under the constitution, to
cases arising under the revenue laws. But the
practice shows the sense entertained by the
Treasury of the limitation to its authority. Whe-
ther the President's pardoning power extends to
such cases or not, there is a close analogy be-
tween a pardon and a remission ; and there is no
more reason why one should affect private rights
and interests actually vested more than the other.
Both suppose legal guilt, and some considera-
tion which makes it consistent with the public
good that it should be forgiven. A pardon, as
well as a remission, often supposes moral in-
nocence.

As to the execution running out of the District
of Maine, not only was the judgment " for the
use of the United States," but the execution was
for their use. If the forfeiture could not be re-
mitted after judgment, the whole debt is still
due, and the United States have a direct interest
in a moiety of it. If the forfeiture might be re-
mitted, so far as the share of the United States is
concerned, they have still an interest in enfor-
cing the demand, since it is intended to secure
to their officers a part of their legal compensa-
tion. But this question cannot arise upon the
pleadings. The defendant admits that he has

executed the process, so far as the remission did
not prohibit it, and he is therefore estopped by
his plea from insisting that it is a void process..

1825.

United States
v.
Morris.

Mr. Justice THOMPSON delivered. the opinion *March 15th.*
of the Court, and after stating the case, pro-
ceeded as follows.:

The judgment of this Court being placed upon
the validity of the plea, and the merits of the
defence therein set up, it is unnecessary parti-
cularly to notice any other questions that have
been discussed at the bar.    To guard, however,
against an inference, not intended by the Court
to be admitted, that the execution, in this case,
was properly issued from the District Court of
Maine to the Marshal of New-York, it is proper
to observe, that this must depend on the con-
struction to be given to the act of Congress of
the 3d of March, 1797, entitled, " an act to pro-
vide more effectually for the settlement of ac-
counts between the United States and the re-
ceivers of public money." Independent of this
act, it has not, and certainly cannot be pretend-
ed, that an execution from the District Court of
Maine could run into any other State. The sixth
section of that act declares, " that all writs of ex-
ecution upon any judgments obtained for *the use*
of the United States, in any of the Courts of the
United States, in one State, may run and be ex-
ecuted in any other State, but shall be issued
from, and made returnable to, the Court where
the judgment was obtained.   The pleadings in
this case show conclusively, that although the .

*Quære,* whe-
ther the exe-
cu ion    upon
the judgment
obtained in the
District Court
of Maine,
could run into
and be execu-
ted    in    the
Southern Dis-
trict of New-
York.

1825.

United States
v.
Morris.

judgment is nominally in favour of the United States, yet it is substantially and beneficially for the use of the custom-house officers of Portland; and that the execution was issued solely and exclusively for their benefit, and not for the use of the United States. If it was necessary to decide this point, it might be difficult to maintain, that this case came within the true intent and meaning of the act; but as the decision of the cause is put upon a point more extensive in its practical application, this is passed by without the expression of any opinion upon it. Nor is it deemed necessary to notice any objections taken to the replication. The argument has been confined principally to the plea, as being the first error on the record.

The plaintiff having replied, without taking any exceptions to the plea, he cannot now avail himself of any defect, that would not have been fatal on a general demurrer.

The objections to the plea may be considered under the following heads:

1. That it does not set forth, with proper averments, the facts and circumstances stated in the petition to the Secretary of the Treasury, and upon which the remission of the forfeiture was granted.

2. That the Secretary of the Treasury had no power to remit after condemnation.

The first objection supposes the case to fall within the rule, that where a justification is set up under a special or limited authority, every thing should be set out to show the case to be

within the jurisdiction of the authority whose protection is claimed and relied upon.

It may be observed, preliminarily, that this objection, coming so late, and at this stage of the cause, is not entitled to much indulgence. If well founded, and it had been made at an earlier day, the plea could have been amended, and much expense and litigation prevented. Every reasonable intendment, therefore, in favour of the plea, ought now to be made.

It by no means follows, that in order to sustain this plea, it is necessary to show that it would have been held good on general demurrer. For it is a rule, founded in good sense, and supported by the settled doctrines of pleading, that many defects are waived and cured, by pleading over, that might have been fatal on demurrer.

But it is far from being admitted that this plea would not have stood the test of a general demurrer. The defendant was a ministerial officer, and placed in a situation, in which he was obliged to judge and determine, whether to obey the command of the execution, or that of the warrant of remission from the Secretary of the Treasury. The latter is set out in *hæc verba* in the plea, and upon its face refers to the law under which it was issued, which was a public act; and in which warrant the Secretary of the Treasury sets forth, that a statement of facts, with the petition of Andrew Ogden, touching the forfeiture, had been transmitted to him by the District Judge of the District of Maine, pursuant to the statute of the United States, entitled, " an

The remission sufficiently set forth in the plea as a justification for the Marshal.

act to provide for mitigating or remitting the forfeitures, penalties, and disabilities, accruing in certain cases therein mentioned," as by the said statement of facts, and petitions remaining in the Treasury Department of the United States may fully appear; and that he having maturely considered said statement of facts, it appeared to his satisfaction, that the said forfeitures were incurred, *without wilful negligence or any intention of fraud*, and thereupon remitted all the right, claim and demand of the United States, *and of all others whomsoever*, upon certain conditions therein specified. This warrant, therefore, upon its face, contained every thing required by the law, and which was necessary to bring the case within the cognisance of the Secretary of the Treasury; and to require any thing more from a ministerial officer for his justification, would be imposing upon him great hardship.

This plea, by setting out the warrant at large, adopts and asserts all the facts therein set forth, and must be taken as alleging, that a statement of facts had been made by the proper officer, and transmitted to the Secretary of the Treasury, and is, therefore, an averment of that fact. It is not, to be sure, a formal, but is a substantial. averment; which is nothing more than a positive statement of facts, in opposition to argument or inference.

It would be altogether useless, and mere surplusage, to set forth such statement of facts in the plea; they would not be traversable. It is not competent for any other tribunal, collaterally, to call in question the competency of the evi-

dence, or its sufficiency, to procure the remission. The Secretary of the Treasury is, by the law, made the exclusive judge of these facts, and there is no appeal from his decision. The law declares, that on receiving such statement, he shall have power to mitigate, or remit, such fine, forfeiture, or penalty, or remove such disability, or any part thereof, if, *in his opinion*, the same shall have been incurred without *wilful negligence,* or any *intention of fraud,* in the person or persons incurring the same. The facts are submitted to the Secretary, for the sole purpose of enabling him to form an opinion, whether there was wilful negligence, or intentional fraud, in the transaction; and the correctness of his conclusion therefrom no one can question. It is a subject submitted to his sound discretion. It would be a singular issue to present to a jury for trial, whether the facts contained in such statement were sufficient or not to satisfy the Secretary of the Treasury, that there was no wilful negligence, or intentional fraud. If the plea, by setting out the warrant at large, contains, as I have endeavoured to show, an averment, that a statement of facts had been transmitted to the Secretary by the proper officer, as required by the law, it was all that was necessary. This gave the Secretary cognisance of the case, and which was sufficient to give him jurisdiction. But what effect that statement of facts would, or ought to have, upon his *opinion,* whether the forfeiture was incurred without wilful negligence, or any intention of fraud, is a matter that could not be inquired into.

But should any doubt remain on this point, it

is removed by the admissions in the replication; which begins by saying, that although true it is that the said William H. Crawford, as such Secretary of the Treasury of the United States, did make and issue the said warrants of remission, as in the said plea of the said defendant is alleged, yet, &c. proceeding to set out facts and circumstances, to show that the legal effect and operation of such remission cannot take away the moiety of the custom-house officers, but *affirming* its validity as to the moiety of the United States, and thereby admitting the authority and jurisdiction of the Secretary of the Treasury, and placing the avoidance of the operation of the remission on the rights of the custom-house officers on a totally distinct ground. The only purpose for which the statement of facts upon which the Secretary acted, could be required to be set out in the plea, would be to show his jurisdiction; and if the replication admits this, it must certainly work a cure, or waiver of the defect. It is laid down by *Chitty*, (*Chitty on Plead.* 547.) and for which he cites adjudged cases which support him, that, as a defective declaration may be aided at common law by the plea, so a defective plea may be aided, in some cases, by the replication. As if, in debt on bond, to make an estate to A., the defendant pleads, that he enfeoffed another to the use of A., (which is not sufficient, without showing that A. was a party, or had the deed,) yet, if the plaintiff reply that he did not enfeoff, this aids the bar. So, if the defendant plead an award without sufficient

A defective declaration may be aided by the plea, and a defective plea by the replication.

certainty, and the plaintiff makes a replication which imports the award to have been made, it aids the uncertainty of the bar. And this rule is not confined to matters of form merely, but extends to matters of substance. Thus, in an action of trespass for taking goods, not stating them to be the property of the plaintiff; this defect will be aided, if the defendant, by his plea, admits the plaintiff's property. So, where several acts are to be performed by the plaintiff, as a condition precedent, and he does not aver performance of all, if it appear by the plea, that the act omitted to be stated was, in fact, performed, the defect is cured. (6 *Binny*, 24. *Chitty*, 402.) We may, then, conclude, that the plea is not, in the present stage of the cause, to be deemed defective on account of the first excepion taken to it.

And the remaining, and more important inquiry is, whether the Secretary of the Treasury had authority to remit the share of the forfeiture claimed by the custom-house officers. And this must depend on the construction to be given to the act under which the power was exercised. The authority of the Secretary to remit, at any time *before* condemnation of the property seized, is not denied on the part of the plaintiff; and it cannot be maintained, that Congress has not the power to vest in this officer authority to remit *after* condemnation; and the only inquiry would seem to be, whether this has been done by the act referred to. (2 *L U. S.* 585.) The present case ought not, perhaps, to be considered

The Secretary of the Treasury has power to remit a forfeiture at any time before or after condemnation, until the money is actually paid over to the Collector for distribution.

altogether as a remission after condemnation. For, it appears, by the warrant of remission, that the statement of facts, by the District Judge, upon which the remission is founded, bears date on the 13th of June, 1814, and the condemnation did not take place until May, 1817; and although the remission was not actually granted until January, 1819, yet, as the facts on which it was founded were *judicially* ascertained three years before the condemnation, there would be some plausibility in maintaining that the remission should relate back to the time when the application was made to the Secretary. But, we think, a broader ground may be taken, and that the authority to remit is limited only by the payment of the money to the Collector for distribution.

It may safely be affirmed, that the question now presented, has never received any judicial decision in this Court. Nor has any case been cited at the bar, or recollected by the Court to have been decided here, containing any principle at variance with the construction of the act now adopted.

In the case of *Jones* v. *Shore's executors*, (1 *Wheat. Rep.* 462.) no such question was involved. The United States there asserted no claim. Nor had the Secretary of the Treasury exercised any authority under the act in question. The money was in Court for distribution, and the sole question before this Court was, whether the then Collector and Surveyor were the actual incumbents in office, or the representatives of the late Collector and Surveyor, in right of their tes-

tator, and intestate, were entitled to the money, and it was decided in favour of the latter. The same principle governed the case of *Van Ness v. Buel*, (4 *Wheat. Rep.* 75.) But these cases decide no more, than that the right of the custom-house officers to forfeitures, *in rem*, attaches on seizure, and to personal penalties on suits brought; and in each case this right is ascertained and consummated by the judgment, as between such officers and the party who has incurred the forfeiture or penalty. But they decide nothing with respect to the right, or the control of the United States, over such penalties and forfeitures. The rights and interests of these officers must necessarily be held subordinate to the authority of the United States over the subject. And that such is the light in which they are viewed, is evident from what fell from the Court in the case of *Gelston v. Hoyt*, (3 *Wheat. Rep.* 319.) It is there said, the seizing officer is the agent of the government from the moment of the seizure up to the termination of the suit. His own will is bound up in the acts of the government in reference to the suit. By the very act of seizure, he agrees to become a party to the suit under the government; for, in no other manner, can he show an authority to make the seizure, or to enforce the forfeiture. If the government refuse to adopt his acts, or waive the forfeiture, there is an end to his claim; he cannot proceed to enforce that which the government repudiates.

It is not denied but that the custom-house officers have an inchoate interest upon the seizure.

and it is admitted that this may be defeated by a remission at any time before condemnation. But, if this is not the limitation put upon the authority to remit, by the act giving the power, it is difficult to discover any solid ground upon which such limitation can be assumed. If the interest of the custom-house officers, before condemnation, is conditional, and subject to the power of remission, the judgment of condemnation can have no other effect than to fix and determine that interest as against the claimant. Those officers, although they may be considered parties in interest, are not parties on the record; and it cannot with propriety be said they have a vested right, in the sense in which the law considers such rights. Their interest still continues conditional, and the condemnation only ascertains and determines the fact on which the right is consummated, should no remission take place. This is evidently the scope and policy of the laws on this subject. The forfeiture is to the United States; and must be sued for in the name of the United States. (3 *L. U. S.* 221. s. 89.) It is made the duty of the Collector to prosecute, and he is authorized to receive the money, and on *receipt* thereof, is required to distribute the same according to law. In all this, however, he acts as the agent of the government, and subject to the authority of the Secretary of the Treasury, who may direct the prosecution to cease. And the act creating the right of the custom-house officers to a portion of the forfeiture, does not

vest any absolute right in them until the money
is received. (s. 91.) It declares, that all fines,
penalties, and forfeitures, *recovered* by virtue of
this act, shall, after deducting all proper costs
and charges, be paid, one moiety into the trea-
sury, and the other moiety divided between the
Collector, Naval Officer, and Surveyor. No part
of the act warrants the conclusion, that the right
of these officers becomes absolute by the con-
demnation. But, on the contrary, the plain and
obvious interpretation is, that the right does not
become fixed until the receipt of the money by
the Collector. Unless, therefore, the act under
which the remission is allowed (2 *L. U. S.* 585.)
limits the authority of the Secretary of the Trea-
sury to the time of condemnation, the custom-
house officers have no right to question the re-
mission. That the act does not, in terms, so
limit the power, is very certain; nor is such a con-
struction warranted by the general object and
policy of the law, which is intended to provide
*equitable relief* where the forfeiture has been in-
curred without wilful negligence or intentional
fraud. It presupposes, that the offence has been
committed, and the forfeiture attached accord-
ing to the letter of the law, and affords relief for
inadvertencies, and unintentional error. And
why should such relief be foreclosed by the con-
demnation? The law was made for the benefit
of those who had innocently incurred the penalty,
and not for the benefit of the custom-house offi-
cers. If any prosecution has been instituted,
the Secretary has authority to direct it to cease

1825.

United States
v.
Morris.

and be discontinued, upon such terms or conditions as he may deem reasonable and just. This enables him to do ample justice to the custom-house officers, not only by reimbursing all costs and expenses incurred, but rewarding them for their vigilance, and encouraging them in the active and diligent discharge of their duty in the execution of the revenue laws. But, to consider their right to a moiety of the forfeiture as absolute, and beyond the reach of the law, after condemnation, would be subjecting the innocent to great and inequitable losses, contrary to the manifest spirit and intention of the law. The Secretary is authorized to direct the *prosecution* to cease and be discontinued. This, undoubtedly, gives him a control over the execution. The suit, or prosecution, does not end with the judgment, but embraces the execution, and it has so been considered by this Court at the present term. And that such is the sense in which the term *prosecution* is used in these laws, is evident from the 89th section of the Collection Act, where the Collector is required to cause suits to be commenced and *prosecuted* to effect. But the prosecution would be to very little effect, unless it extended to and included the execution. The provision in the third section of the act under which the remission is allowed, affords a very strong inference, that the rights of the custom-house officers are conditional, and subordinate to the authority to remit. It declares, that nothing herein contained shall be construed to affect the right or claim of any person, to that part of any

fine, penalty, or forfeiture, to which he may be
entitled, when a prosecution has been com-
menced, or information has been given, before the
passing of this act, or any other act relative to
the mitigation or remission of such fines, penal-
ties, or forfeitures; thereby clearly showing, that
before such power to remit was given, the right
of the custom-house officers attached upon the
commencement of the prosecution, and could
not be devested; but that such right was now
modified, and made conditional. This provision
is contained in the first law which passed in the
year 1790, (2 *L. U. S.* 103.) giving authority to
the Secretary of the Treasury to remit penalties
and forfeitures. This act was temporary, but
continued from time to time until the 8th of May,
1795, when it expired, and was not revived until
March, 1797, leaving a period of two years, when
the power to remit was not vested in the Secre-
tary of the Treasury, and to which period the
provision in the third section of the act of 1797
probably refers.

The powers of the Secretary of the Treasury
have been supposed analogous to those of the
*Commissioners of the Customs* in England, un-
der the statute 27 Geo. III. c. 32. s. 15. But
it is very obvious, on reference to that statute,
that the authority of the Commissioners to re-
mit, was limited to the condemnation. These
powers were afterwards, by statute 51 Geo. III.
c. 96. extended, but still limited to remissions
before condemnation. It was probably not
deemed advisable to confer more enlarged powers

upon the *Commissioners of Customs*, but that a power somewhere to remit after judgment of condemnation was proper and necessary; and, accordingly, by statute 54 Geo. III. c. 171. this power is transferred to the *Commissioners of the Treasury.* The two former acts are recited, and the recital then proceeds thus : " Whereas it is expedient, that the provisions of the said acts should be further extended, and that the Commissioners of his Majesty's Treasury should be empowered to restore, remit, or mitigate any forfeiture, or penalty, incurred under any laws relating to the revenue, or customs, or excise, or navigation, or trade, either *before* or *after* the same shall have been adjudged in any Court of law, or by or before any Commissioner of Excise, or Justice of the Peace ;" and it is then enacted, that the Commissioners of the Treasury may order any goods seized as forfeited, to be restored, on the terms and conditions mentioned in the order, and may mitigate or remit any penalty or forfeiture which shall have been incurred under the revenue laws, and upon such terms and conditions, as to costs, or otherwise, as under the circumstances of the case shall appear reasonable. The enacting clause in this statute is general, like our act. It does not, in terms, give the power to the Commissioners of the Treasury to remit after condemnation, and yet there can be no doubt the power extends to such cases ; and, if this be so, what becomes of the rights of informers, which have been supposed to become, by the judgment of con-

demnation, so vested, as not to be devested even by a pardon.

The powers given by this statute to the Commissioners of the Treasury, are very analogous to those given by our act to the Secretary of the Treasury, and the phraseology employed to confer such powers is nearly the same in both. Neither the one nor the other, in terms, extends the power to remission after condemnation; and there can be no reason why the same construction should not be given to both. No vested rights of informers, or custom-house officers, are violated in either case. These rights are conditional, and subordinate to the power of remission, and to be provided for in the terms and conditions upon which the remission is granted.

The practical construction given at the Treasury department to our act, has not been particularly inquired into. It is understood, however, that until within a few years, remissions were granted as well after as before condemnation, but that latterly this power is not exercised after condemnation, nor will the remission be granted before condemnation, unless the petitioner will admit the forfeiture has been incurred. This practice is probably founded on the impression, that the equitable powers of the Secretary ought not to be interposed, until the legal guilt of the petitioner is ascertained. But the rights of the custom-house officers would seem to be as much affected under such a practice, as to remit after condemnation. Those rights are said to be inchoate by the seizure, and to be consummated

by the condemnation. The confession of the forfeiture before condemnation, remaining on the record of the Treasury department, although not a judicial condemnation, might well be said to consummate the rights of the custom-house officers, if they are to be considered as becoming absolute when the forfeiture is ascertained. The condemnation does no more than to determine that question, so far as respects the rights of those officers; for the condemnation is not to them, but to the United States; they are no parties to the judgment; and their rights must depend upon, and be governed and controlled by, the acts of Congress, which create and regulate such rights; and by these acts, those rights, in the opinion of the Court, do not become fixed and absolute by the condemnation, but are subject to the power of remission by the Secretary of the Treasury, until the money arising from the forfeiture is received by the Collector for distribution. The warrant of remission, therefore, in this case, when served upon the Marshal, operated as a supersedeas to the execution, and justified a discharge and restoration of the property levied upon, and exonerates him from all claim to damages by the custom-house officers.

Mr. Justice JOHNSON. I entirely concur with my brethren in the opinion, that the power of the Secretary to remit extends as well to cases after as before judgment rendered. The question is one which I have had to consider repeatedly in my circuit, and which I so decided more than

twelve years ago. The reasons on which I then founded, and still adhere to this opinion, were briefly these :

I consider the contrary doctrine as neither consistent with the words nor the spirit of the act of 1797. The unavoidable consequence of it would be, that the suitor for grace is shut out of every legal defence ; and it would be difficult to assign a reason why justice should be refused by the hand that tenders mercy. Many defences are not only consistent with the claim for remission, but furnish in themselves the best ground for extending the benefit of the act to the party defendant. He who supposes his case not to come within the construction of a law, or that the law is repealed, expired, or unconstitutional, cannot be visited with moral offence, either in the act charged or the defence of it. Yet, how is the question of right ever to be decided, unless he is permitted to try the question before a Court of law ? In such a case, pertinacious adherence to his offence cannot be imputed to him, since resisting the suit on the one hand, while he sues for remission on the other, amount to no more than this, that he denies having violated the law ; but if the Court thinks otherwise, he then petitions for grace, on the ground of unaffected mistake ; a point on which, of course, he must satisfy the Secretary, before he can obtain a remission.

If the question be tested by the letter of the law, it will be found, I think, to lead to the same conclusion. The words are, " whenever any

person, who shall have incurred any fine, penalty, forfeiture, or *disability*, or shall have been interested in any vessel, goods, wares, or merchandise, which shall have been subject to any seizure, forfeiture, or disability, by force of any present or future law of the United States, for laying or collecting any duties or taxes, or by force of any present or future act concerning the registering and recording of ships or vessels, &c. shall prefer his petition to the Judge of the District in which such fine, penalty, forfeiture, or disability, shall have accrued, truly and particularly setting forth," &c. then, &c. the power of remission may be exercised by the Secretary, and the prosecution if any, ordered to be staid.

On perusing this act, it must be conceded, that the terms are sufficiently general to extend the powers of the Secretary, without limit, to the cases of fine, forfeiture, or disability, occurring under the several laws specified. The limitation, therefore, must be sought for either in some principle of construction, or in some principle *aliunde*, which is competent to impose such limitation.

But, with a view to construction, there will be found several considerations calculated to extend the power granted to cases wherein judgments have been obtained, rather than to restrain it to any pre-existing state of things. If the question be tested by the technical signification of the terms, in strictness the power would be *confined* to cases in which judgment had been obtained, rather than to those of a contrary description.

Fines, penalties, and disabilities, are not *incur-* *red*, and do not accrue, in the technical sense of the terms, until judgment. With regard to disabilities particularly, (and there is no discrimination made between the cases,) I would notice that disqualification to hold any office under the United States, which is imposed upon a smuggler for seven years. Who can question that it must be counted from the day of judgment, and not from the day of the offence or information? Or who can suppose that it could be made a plea to the authority of a public officer at any time before conviction?

But, with regard to fines and forfeitures, also, there are various provisions of the United States laws, which look positively to a trial as necessary to determining whether such fines and forfeitures have been incurred. I would notice particularly the 29th section of the Collection Law of 1799, under which, incurring the penalty for the offence there stated, is made to depend upon the master's not being able to satisfy the Court, by his own oath, or other sufficient testimony, of certain facts, which, in the given case, prevent his incurring the fine.

So, also, of the 67th section of the same law, in which a forfeiture is made to accrue upon a state of facts which positively requires the intervention of a Court of justice, and which, of consequence, cannot be said to have been incurred or accrued until judgment.

But other considerations present themselves upon this law, which lead to the same conclusion.

1825.

United States
v.
Morris.

The words are, " shall prefer his petition to the Judge of the District in which such fine, penalty, forfeiture, or disability, shall have accrued." That this word accrued meant something more than the term incurred, used in the previous part of the section, is obvious from this consideration, that an offence might be co amitted in one District, and the offender prosecuted in another; but it never was imagined, that the suit for remission could be going on in the District where the penalty was incurred, in one sense of the term, and the prosecution in another. The term accrued, therefore, has been universally held to be here used with relation to the seizure, information, or suit for the penalty; and so far from its being held to have any effect in confining the time of prosecuting this claim for remission to the interval between information and judgment, that, practically, we know, in some of the most commercial Districts, the construction adopted was, that the penalty did not accrue until conviction; and, hence, suffering a decree or judgment to pass, was considered as essential to making up the case in which the suit for remission might be preferred. And there was some reason for this practice, since the necessary meaning of the term, as distinguished from the word *incurred,* shows, that there could hardly ever occur a case in which the suit for remission was not preceded by the suit for the penalty. But, if the defendant was compelled to confess that he had violated the law, and so the act requires, what reason could exist why judgment should not forthwith

pass against him ? And if, under such circum-
stances, the judgment was a bar to the remission,
the boon held out to them was all a fallacy ; nay,
more, it was a lure to ensnare him ; for the law
imposes no obligation on the Judge to stay pro-
ceedings ; and whether he would or not, rested
with him, or with the District Attorney, until the
Secretary should have time to act upon the ap-
plication for remission.

The replication, however, exhibits the true
ground on which the real plaintiff in this suit is
compelled to rest his case : which is, that by
virtue of the judgment, certain rights were vested
in him, over which the remitting power of the
Secretary does not extend. In making up this
replication, the party ought to have felt the real
difficulties of his case. It is generally true, that
the rules of pleading furnish the best test of a
right of action. The effect, in this case, was to
introduce a new personage into the cause ; and if
I were disposed to get rid of the question, on a
technical ground, I should find no difficulty in
coming to the conclusion, that there is a depar-
ture in this plea, and he has abated his writ.
How, in fact, the name of the United States
comes at all to be used in this cause, is to me a
mystery. The very policy of the law in this
part of its revenue system is avoided by it, and
would be frustrated, if the practice could be
countenanced. That the name of the United
States should be used against its will, and an at-
torney for the United States nominated by a
Judge, to act where the attorney of the United

1825.

United States
v.
Morris.

States refuses to act, and that without any authority by statute, I acknowledge has excited my surprise.

The principles asserted are, that an absolute interest is vested by law in the Collector; that the United States are the trustees to their use; that the act of the trustee shall not defeat the interests of the *cestui que use*, and that he shall have the use of the trustee's name to vindicate his rights, that too in an action for damages.

The whole of this thing appears to me to be wrong. If the right was an absolute, substantive, individual right, why was not the suit brought in the name of the Collector? If his interest is only an equitable interest, by what known rules of pleading can he avail himself of his mere equitable interest in a suit at law? or rather, can he make his appearance as party in the suit instituted by his trustee? and that too, a suit for damages? It all results in a strong attempt to modify the operation of our laws, and to regulate the rights and powers of our officers, by some fancied analogy with the British laws of trade, and British revenue officers.

Our system is a peculiar system; and nothing is clearer to my mind, than that, in many particulars, it is constructed with a view to avoid that very analogy which is here set up, and those consequences and embarrassments which might grow out of it. In the instance before us, relief was to be provided for a case of misfortune and of innocence, and nothing could have been more absurd, than to suffer the vested rights of informers

and seizing officers to embarras the government
in its benevolent and just views towards the ob-
jects of this law. Mercy and justice could only
have been administered by halves, if Collectors
could have hurried causes to judgment, and then
clung to the one half of the forfeiture, in con-
tempt of the cries of distress, or the mandates of
the Secretary. Hence, according to our system,
all the suits to be instituted under the laws over
which the Secretary's power extends, are com-
menced in the name of the United States. No
other party is permitted to sue ; they are all made
national prosecutions ; all the legal actors are
those who are bound in obedience to the govern-
ment that prosecutes. Nothing is more untena-
ble than the idea, that at any one stage of the
prosecution, the government assumes the charac-
ter of a trustee ; an idea so abhorrent to the prin-
ciples of the common law, that to make the king
a trustee, was to make him absolute proprietor.
Nor is it until the character of prosecutor for of-
fences against itself is put off, that the law raises
a state of things, in which the relation of trustee
and *cestui que use* actually can arise. This is
when the money is paid into the hands of the
Collector. To him the law directs that it shall
be paid, in order that it may be distributed.
What right, I would ask, would any one of the dis-
tributees here have to move the Court, that the mo-
ney be paid to him, and not to the Collector ?
There are cases in which other persons than a
Collector may be entitled in the capacity of in-
formers, and it may then be necessary for the

Court to decide on individual rights. But in no case, that I am aware of, arising under the collection law, can the Court be called upon to pay the money in any other way than to the Collector, to be by him distributed; and this distribution I consider as a mere boon from the government, which they may justly, and do practically, reserve a sovereign control over, until so paid under their laws. The gift is from them, of a thing perfected to them, and they may modify and withdraw that gift, *ad libitum*. When once paid away, according to legislative will, their control is at an end, and the right then, and not till then, becomes vested and absolute, as between them and their officers, whom, to the last, the law regards as absolute donees. That such is the view of the Legislature, and that in the exercise of that discretion, they still meant to be reasonable and just, and not to exercise an *ex post facto* power in such case, is all conclusively proved in the third section of this act, as has been very justly insisted on in argument. During two years, this power of the Secretary had remained suspended, and with regard to rights accruing during that time, the Legislature declares, that as the modification imposed upon the grant to the informer, or siezing officer, by virtue of that dispensing power, did not then exist, their proportions should not afterwards be subjected to it, but the Court may assess their proportions in a summary manner. There cannot be a more explicit declaration of legislative understanding than this clause presents, inasmuch as it makes no dis-

crimination between the cases of judgment and other cases, but considers the right accruing to them the same before judgment as it is after.

There is one peculiarity in this case, which, in my opinion, precludes the possibility of recovery, independently of the general principle; which is, that this action is brought against the Marshal for not executing process issuing from another State. It certainly presents a dilemma from which I think it impossible for the party plaintiff to escape. The right to issue such process originates in the 6th section of the "act more effectually to provide for the settlement of accounts between the United States and receivers of public money," by the words of which the power is explicitly confined to the case of executions on judgments obtained for the use of the United States.

The real plaintiff here, then, is reduced to this alternative: Either the judgment was for his use or it was not. If not for his use, then he cannot be damnified by the defendant in refusing to execute it. But if for his use, it cannot be for the use of the United States, and then the execution issued wrongfully, and was rightfully disobeyed. If it be replied, that the judgment, in the first place, was obtained for the use of the United States, it only brings us back to what I before observed, that so entirely is this true, as to raise no vested right in any one on the solitary ground of an eventual contingent interest.

Judgment affirmed.