Nott, J.,
dissenting.
From the statements made in the petition, I think these three controlling facts appear:
1st. The seizures were made and the proceedings in rem were instituted by the government upon information given exclusively by the claimants, and the claimants did first inform the officers making the seizure and instituting the proceedings, “ of the cause, matter, or thing whereby the forfeiture of the property aforesaid was incurred,” and they were "the first to discover and ascertain that said Joseph A. Rhomberg ” “ was engaged in the fraudulent practices ” of which he confessed himself to be guilty.
2d. The property seized for forfeiture and relinquished in the compromise and settlement was worth the sum of $350,000.
3d. The government received in settlement and compromise of the seizures and proceedings instituted on the information of the claimants, the sum of $220,102, and such sum of $220,102 was received exclusively from, and as the direct consequence of the said seizures and proceedings, and was entirely the consideration of the said compromise.
In the case of McLane v. The United States, 6 Peters, 426, Mr. Justice Story sets forth the law of seizures and forfeitures as it existed then, and is admitted still to exist, thus :
“ The duty of the collector in superintending the collection of the revenue, and in making seizures for supposed violations of law is oner ous and full of perplexity. If he seizes any goods it is at his own peril, and he is condemnable in damages and costs if it shall turn out, upon the final adjudication, that there was no probable cause for seizure. As a just reward for his diligence, and a compensation for his risks, at once to stimulate his vigilance and secure his activity, the laws of the United States have awarded to him a large share of the proceeds of the forfeiture. But his right by the seizure is but inchoate; and although the forfeiture may have been justly incurred, yet the government has reserved to itself the right to release it, either in *120 whole or in part, until the proceeds have been actually received for distribution ; and in that event and to that extent it displaces the right of the collector.” “But whatever is reserved by the government out of the forfeiture is reserved as well for the seizing officer as for itself and is distributable accordingly.”
The case of McLane differs from the case at bar in this : The vessel and cargo “were forfeited for a violation of the non-intercourse acts.” But the act of 2d January, 1813, allowed the Secretary of the Treasury to remit the forfeiture on the “payment of the duties which would have been payable by law on syich goods, fyc., if legally imported.” The Secretary accordingly remitted the forfeiture “ upon payment of the double duties imposed, by the act of the 1st July, 1812.” Upon these facts the Supreme Court held that “ without question these acts of Congress were directory and mandatory to the Secretary,” but that, nevertheless, “in point of law, no duties, as such, can legally accrue upon the importation of prohibited goods,” and that “ the double duties are referred to [by the act] as a mere mode of ascertaining the amount intended to be reserved out of the forfeiture ; and not as a declaration on the part of the government that they were to be received as legal duties upon a legal importation.” The case, therefore, turned upon the construction of the act of 1813, and is not a case absolutely in point. If the. Supreme Court had been of the opinion that Congress intended the double duties to be reserved “ as such,” and not by way of forfeiture, they would have doubtless given effect to the statute, and held that it changed the existing law respecting the share of the collector. But although the case is not a case absolutely in point, it nevertheless involved a construction of the act of 1.797, and called forth a clear and unequivocal declaration of the rights of persons making seizures under the laws of the United States, and a positive judicial annunciation of the policy of the government toward such persons, which is that “ whatever is reserved by the government out of the forfeiture is reserved as well for the seizing officer as for itself.”
The case at bar does not involve a construction of the act of 1813, or of any similar act, but does come within the general principle an-nunciated by the Supreme Court, and does show that the acts of the collector and his associate officers were of a kind that entitles him to the benefits of the liberal and unvarying policy which has been pursued by the government toward its officers, and to the remuneration which the government has always accorded, through Congress, through its executive department, and through its judiciary, to those whose acts it has adopted, and through whose labors it has succeeded. These *121 acts arc set forth clearly in the report of the Secretary of the Treasury to Congress, February 5, 1866, which is made by reference a part of the petition. The Commissioner of Internal Revenue says, (report, January 25, 1866:)
“Early in April, 1865, it was discovered that large quantities of distilled spirits were passing through Buffalo, shipped from some point or points west, to Hew York city, under circumstances which induced the belief that the law was being in some way evaded. The attention of Collector Dorsheimer and Assessor Presbrey, of the thirtieth district of Hew York, was called to the matter, and after examination they deemed it their duty to proceed to New York city to make the necessary investigation and ascertain the facts in the case.
“On the 17th of April Messrs. Dorsheimer and Presbrey reported from New York that they had found in the hands of A. L. Rowe & Co. 112 barrels, and in those of A. B. Warner 56 barrels; that a lot had also been found in possession of David Dows & Co., and 176 barrels on the dock. They added that all this property had been seized by Collector Dorsheimer, and, under the advice of the United States district attorney, passed over to the United States marshal. A large quantity was stated by them to be still on the way between Buffalo and New York, which would be seized upon its arrival.
“ Messrs. Dorsheimer and Presbrey expressed the opinion that a fraud had been committed, but that it would require a thorough investigation at Dubuque, and advised that some one be sent there at once.
“ Nr, Presbrey tvas thereupon directed by telegraph to proceed to Dubuque and to make the necessary investigation. * *
u On the 24th of April, Collector Dorsheimer seized at Buffalo 11 barrels of alcohol. * .* * * * *
“ April 28, Mr. Presbrey reported that he had obtained satisfactory evidence of the fraud; that the deputy collector had seized the distillery with its appurtenances; about 50,000 bushels of shelled corn,” &c.
These facts show that the collector and his associates embarked time, money, and ultimate risk in the seizure, and that they did so on the faith of the general policy of the United States, to which, as I think, the 179th section of the internal revenue act conforms, and of which it is intended to be in furtherance. The petition then shows that the distiller confessed his guilt, and that the owners paid to the government for the relinquishment of this very property, and the discontinuance of the proceedings instituted for its forfeiture, the sum of $220,102, but that the government did not divide this sum with the claimants, *122 and, on the contrary, appropriated all but $12,500 to its exclusive use. This division was based on what was termed a “ compromise ” of the suit or proceedings, wherein $195,102 were said to be received as taxes on a part of the property relinquished, and $25,000 as forfeiture reserved of the same property. The remainder of the property, it may be noted, was released because it had been illegally seized, being liable to distraint and not to forfeiture.
If this disposition can be made of the avails of the proceedings in rem, based upon the collector’s seizures and information, it is, I feel warranted in saying, the first case in the history of our revenue laws where perfect good faith has not been kept with the officers making the seizures; and where the government has received a greater share of the proceeds or result of the seizure than the party who instituted it, and at whose risk and through whose diligence it was prosecuted. That such a distribution must rest on something more substantial than the Secretary’s calling the moneys which he has retained by one name instead of another, is not disputed ; but neither the reasons advanced nor the authorities cited afford, in my j udgment, a sufficient ground to sustain the doctrine contended for; and I am compelled, therefore, to dissent from the conclusion of the court.
The case of the United States v. Morris, 10 Wheat., 246, is cited by the defendants. It decides nothing more than this : that the authority to remit the forfeiture is not limited to the period before condemnation or judgment, but that ‘‘ the authority to remit is limited only by the payment of the money to the collector for distribution.” So Mr. Justice Thompson also says : “ If the government refuse to adopt his [the informer’s] acts, or waive the forfeiture, there is an end to his claim; he cannot proceed to enforce that which the government repudiates.” Whence I infer that the Supreme Court believed that if the government did adopt his acts, and did not waive the forfeiture, nor repudiate his proceedings, but, on the contrary, reaped a great and direct benefit from them, that then and in such a case the informer would be entitled to recover his share of that which the government received by and through the adoption of his acts, and the proceedings upon his information.
In the case now at bar, there was an action instituted by the government upon and as the direct consequence of the collector’s proceedings. Whether that action was prosecuted to judgment and the money was paid for distribution upon the judgment, or whether it was ended by compromise and the money was paid for distribution under the com promise, I deem to be immaterial. Whether that action was rightfully *123 brought and the government might have recovered ultimately if it had proceeded, or whether it was brought wrongfully and the defendants, to be rid of it, paid their money voluntarily and foolishly, I also deem to be immaterial. The only question for me to consider, in my opinion, is whether the money received was the fruit of the action. The petition very clearly shows that it was. No other action or proceeding was pending- against Rhomberg to which the compromise could be extended ; no other information had been given which could be deemed the basis, in whole or in part, for that action. Through the proceedings of the collector the government received a large sum; without the' proceedings of the collector it would have received nothing. The money was the avails of the action, and the action was to enforce the forfeiture. If any further circumstance were needed to establish this, it is found in the fact that the suit was not discontinued first and the taxes paid afterward ; nor were the taxes paid voluntarily and the suit discontinued afterward; but the money paid was exacted by the suit, and by it alone, and the consideration which the government gave for this money so paid was not a receipt for taxes, but a relinquishment of the property which was held for forfeiture. ■
It was thought by the Secretary of the Treasury that the government had a lien upon the property for its unpaid taxes. That might be so ; yet it is most certain that the action in the district court was never instituted to enforce that .lien. That was an action in which the government and the collector were jointly and equally interested, brought to recover property which the law declared forfeited for the fraud confessed of the manufacturer. Whatever was received through and in consideration of its discontinuance was received for the use and benefit of the parties jointly interested, and was to be divided and apportioned as the law determines the extent of their respective interests. If the suit had been discontinued, and the agreed forfeiture paid, and the property given up to the defendants, and if the government had then proceeded with knowledge acquired through the informer’s discoveries to enforce its lien for taxes by another proceeding, then it might be held correctly that the informer’s rights were gone. But when the government never trusted the defendant for an hour, nor gave up possession of the property until the money was paid, but used the suit brought on the claimant’s information as its only engine for coercing payment, how can we call that a payment of taxes which was in fact a consideration given for the discontinuance of a suit and *124 the surrender of property seized, and subject, or supposed to be subject, to forfeiture 1
It is also thought by a majority of my brethren that the power given to the Commissioner, by the 44th section, “ to compromise all suits relating to internal revenue,” gave to him a new power over the rights of the collector, and an authority to distribute the proceeds of the suit in a manner different from that which the law had previously determined. This word “ compromise” has a common and well known signification, and always imports a mutual concession ; but it must be, as-I think, a concession between the parties to the “ suit.”
Now here we have a proceeding in which the government is the plaintiff, and the owner of certain property is the defendant. The “ compromise ” referred to is a settlement between these parties, and not between the plaintiff and third persons, strangers to the record. The statute speaks of a “ compromise ” of the “ suit ” and not of a right or claim growing out of the seizure, and relating solely to one who is no party to the “ suit.” It was no concern of Rhomberg what was to be done with the money which he paid to be clear of his own wrongful acts. All that he was interested in was in recovering back the property against which the suit was brought. There could be no compromise where there was no controversy. As between the claimants and the government there was no controversy, for they were interested only in the forfeiture or its avails ; and as to them, the law determined how they should be apportioned. To extend the signification of this word, so far as to infer from it a power in the Secretary to compromise more than the “ suit,” and an authority to reapportion the avails in a manner different from that which the law had already done, or which a court might do, if the proceeding went to judgment, seems to me to be carrying the meaning of the word beyond the bounds of fair construction, and beyond the intent and policy of the law.
There is, as I understand the facts, no doubt but that the claimants would have been entitled to the moiety of this sum of $195,102, if the Secretary had not called it by the name of taxes. All that there was of the compromise was that the owners paid $220,102, and received back their property, worth $350,000, with a discontinuance of the suit. As to the imaginary parts of which this sum of $220,102 was composed, it rested entirely within the breast of the Secretary to say what they should be. He had indeed determined within his own mind that the compromise should consist in his receiving a sum equal to the taxes on a part of the'property, and another sum, fixed arbitrarily, which he called the forfeiture. If, after the money had been paid, *125 bad reconsidered his determination, and called the $195,102 forfeiture instead of taxes, the claimants would have been entitled to one-half of this, and the defendant in the other suit would have been neither injured nor affected; and if, on the contrary, he had reconsidered his determination, and called the $25,000 taxes on some other portion of the property relinquished, the claimants would have been entitled to nothing, and the defendant in the other suit would have been neither benefited nor affected. Wow the plain English of this is, that the Secretary had not only a power to compromise the suit, but an absolute right of distribution over the proceeds. The record indicates, and I understand the fact to be, that no express or stipulated compromise was ever entered into between the government and the owners, which provided for or affected the distribution of the moneys received. A bond was indeed given upon the release of the property for the costs, taxes, and $25,000 in lieu of penalties ; but the $25,000 in lieu of penalties was not to be paid as a separate and distinct sum; and on the contrary, the bond was conditioned for the payment of three in-stalments, “ $50,000 in one month, and the balance in two equal payments — one-half in three months, and the other in five months.” This was equivalent to the payment of a sum in gross, andmade the $195,102, called taxes, as completely a part of the sum “reserved iy the government out of the forfeiture ” as the $25,000 called “ in lieu of penalty and “whatever is reserved by the government out of the forfeiture,” says the Supreme Court, “ is reserved as well for the seizing officer as for itself ” — (McLane v. The United States, p. 426.)
The conclusions to which I have come are these:
1. The sum of $220,102 was, in the language of .the Supreme Court, “ a gross sum ” reserved by the government “ out of the forfeiture as a condition of the remission,” (6 Peters, 427 ;) and calling it money received for taxes could not alter its character, nor impair the collector’s rights.
2. The government and the collector were in effect partners in the enterprise ; the government had a controlling right to abandon the ad: venture, but had no right to remit its partner’s share and retain its own, nor to apply, upon an individual indebtedness, moneys received through the joint enterprise.
3. The 44th section of the internal revenue act 30th June, 1864, authorized the Commissioner of Internal Eevenue to compromise with the owners of the forfeited property, but did not authorize him to com-, promise with the collector. The moneys received from such a compromise, and in consideration of a release of the forfeited property, *126 were, in legal effect, moneys reserved from the forfeiture and the fruit of an action, in which the collector was jointly and equally interested with the government.
4. The acts of the collector in the case at bar came within the geneial policy of the United States; which is, that whenever the government adopts the acts of the informer, and proceeds upon his discoveries and to his risk, it will share equally with him whatever may be received through his proceedings; which policy lias never been departed from since the establishment of this government, and has been clearly indicated by its statutes, and solemnly and repeatedly pronounced by its highest judicial tribunal.