**In re Theodore OLSON.**

**Division No. 86–1.**

United States Court of Appeals,
District of Columbia Circuit.
Division for the Purpose of Appointing
Independent Counsels.
Ethics in Government Act of 1978,
as Amended.

April 2, 1987.
As Amended May 1 and May 27, 1987.

Before MacKINNON, Presiding, MORGAN and PELL, Senior Circuit Judges.

PER CURIAM.

Pursuant to 28 U.S.C. § 594(e), the Independent Counsel has applied for referral of certain matters related to the investigative jurisdiction granted previously in our Orders dated April 23, 1986, and May 29, 1986. Specifically, the Independent Counsel in her Application for Referral of Related Matters ("Independent Counsel Application") seeks investigative and prosecutorial jurisdiction over "certain allegations against two former Department of Justice ("Department") officials, Edward C. Schmults ("Schmults") and Carol E. Dinkins ("Dinkins"), in a report of the Judiciary Committee of the House of Representatives ("Committee") entitled *Report on the Investigation of the Role of the Department of Justice in the Withholding of Environmental Protection Agency Documents in 1982–83* ("Committee Report")." Independent Counsel Application at 1–2. The Department of Justice has responded to the Independent Counsel's application for referral of related matters, urging that 28 U.S.C. § 592(b)(1) precludes the Division from granting the request of Independent Counsel. ("Department of Justice Response"). The Independent Counsel has in turn replied to the objections of the Department of Justice. ("Independent Counsel Reply"). We agree generally with the Department of Justice that the applicable statute requires us to deny the Application because the Attorney General has twice denied such request.

## I

### Background

The House of Representatives in the 97th Congress conducted two separate investigations [1] into the administration by the Environmental Protection Agency of the Hazardous Substance Response Fund ("Superfund"). In the course of those investigations the Committees requested and subpoenaed a number of documents. Acting on advice from the Department of Justice, the EPA promptly acceded to some of these requests, but the EPA initially opposed other requests, asserting claims of executive privilege and that the documents were "enforcement sensitive" or "deliberative." However, it was eventually agreed that the Committees would have access to the requested documents except "enforcement sensitive" documents, the release of which it was felt could hamper law enforcement efforts. It was also agreed that the Department would not shield documents containing evidence of criminal or unethical conduct by agency officials.

In the next Congress, the House Judiciary Committee decided to investigate the

---

1. One investigation was by the Subcommittee on Investigations and Oversight (the Levitas Subcommittee) of the Committee on Public Works and Transportation, and the other investigation was by the Subcommittee on Investigations and Oversight (the Dingell Subcommittee) of the Committee on Energy and Commerce.

conduct, during the prior investigation, of certain individuals in the Justice Department. As a consequence, the Committee initiated an investigation and compiled a report in excess of 3,000 pages, entitled *Report on the Investigation of the Role of the Department of Justice in the Withholding of Environmental Protection Agency Investigative Documents from Congress 1982–83.*

Upon completion of this follow-up investigation, the House Judiciary Committee directed its Chairman to transmit the Committee Report to the Attorney General. In his December 12, 1985, letter transmitting the Report, the Chairman of the House Judiciary Committee requested the Attorney General to conduct an independent determination and to consider the Chairman's letter as "an official request of the Committee on the Judiciary that you apply for the appointment of an independent counsel under the provisions of 28 U.S.C. § 591, *et seq.*" The letter from the Committee also stated that among other possible issues raised by the report, it would appear appropriate that the Executive Branch examine whether, during the Superfund Investigation in the prior Congress, there had been any violations of 18 U.S.C. §§ 1001, 1505, 1621–23, 371, "or any other provision of federal law."

After studying the Committee Report, the Attorney General determined that it contained sufficient information to warrant "preliminary investigations," within the meaning of 28 U.S.C. § 592 as to:

(A) Whether the conduct of former Assistant Attorney General Theodore Olson in giving testimony at a hearing of the Subcommittee on Monopolies and Commercial Law of the House Judiciary Committee on March 10, 1983, and later revising that testimony, regarding the completeness of the Office of Legal Counsel's response to the Judiciary Committee's request for OLC documents, and regarding his knowledge of EPA's willingness to turn over certain disputed documents to Congress, violated 18 U.S.C. § 1505, § 1001, or any other provision of federal criminal law;

(B) Whether the conduct of former Deputy Attorney General Edward Schmults, resulting in the undisclosed withholding of documents from the House Judiciary Committee from March, 1983, through April, 1984, violated 18 U.S.C. § 1505, § 1001, § 1512 or any other provision of federal criminal law;

(C)(1) Whether the conduct of former Assistant Attorney General Carol Dinkins, resulting in the undisclosed withholding of documents from the Judiciary Committee during its investigation, violated 18 U.S.C. § 1505, § 1001, § 1512, or any other provision of federal criminal law; and (2) whether the conduct of Mrs. Dinkins in preparing and submitting a declaration in the case captioned *United States v. United States House of Representatives*, Civil No. 82–3583 (D.D.C.), violated 18 U.S.C. § 1503, § 1621, § 1623, § 401, § 1001, § 1512, or any other provision of federal criminal law.

Report of the Attorney General Pursuant to 28 U.S.C. § 592(c)(1) Regarding Allegations Against Department of Justice Officials in United States House Judiciary Committee Report ("Report of Attorney General") at 3–5.

Following the foregoing determination, the Attorney General directed the Public Integrity Section of the Department to conduct the preliminary investigation into the allegations contained in the Committee Report. Thereafter, the Public Integrity Section, as well as John C. Keeney, Deputy Assistant Attorney General for the Criminal Division, and William F. Weld, United States Attorney for Massachusetts, designated by the Attorney General to be his Special Assistant in the matter, made recommendations to the Attorney General as to whether any allegations in the Committee Report warranted further investigation by an independent counsel.

After considering all these recommendations, the Attorney General on April 10, 1986, requested the Division to appoint an Independent Counsel to investigate the allegation against Olson set out in section A above, *"and any other matter related to that allegation."* Report of Attorney Gen-

eral at 11 (emphasis added). The Attorney General also stated in his report to the Division that he had determined, pursuant to § 592(b)(1), that there were no reasonable grounds to believe that further investigation or prosecution was warranted with respect to the allegations against Schmults and Dinkins. *Id.* at 26 & 47–48.

Acting upon the Attorney General's report, the Division for the Purpose of Appointing Independent Counsels on April 23, 1986, filed an order appointing independent counsel and defining his jurisdiction.[2] In re: Theodore Olson, D.C.Cir., Division No. 86–1. In response to the request of the Attorney General, Independent Counsel was ordered

> to investigate and pursue the question whether testimony of Mr. Theodore Olson and his revision of such testimony on March 10, 1983, violated either 18 U.S.C. § 1505[3] or § 1001,[4] *or any other provision of federal law.*

In addition to this authority the Division further

> ORDERED, ... that the Independent Counsel shall have jurisdiction to investigate *any other allegation of evidence or violation of any federal criminal law by Theodore Olson developed during investigations by the Independent Counsel referred to above, and connected with or arising out of that investiga-*

*tion and the Independent Counsel shall have jurisdiction to prosecute for any such violation.*

The jurisdictional order also noted that the Independent Counsel would have "all the powers and authority provided by the Ethics in Government Act of 1978, as amended, and specifically by 28 U.S.C. § 594." This section provides an independent counsel with very broad investigative and prosecutorial powers. The Independent Counsel then proceeded to conduct an investigation of Theodore Olson as authorized by her appointment.

By letter of November 14, 1986 ("Independent Counsel letter"), the Independent Counsel requested the Attorney General to refer to the Independent Counsel the allegations in the Committee Report against Schmults and Dinkins and the criminal investigation being conducted by the Department of Justice of former General Counsel to the Environmental Protection Agency, Robert M. Perry. This request was made pursuant to 28 U.S.C. § 594(e)[5] on the claim that under the statute, the allegations were "related matters" to the investigation of Olson that she was then conducting.

After reciting the incidents of her investigation of Olson to date, the Independent

2. The independent counsel appointed by the Division on April 23, 1986, Mr. James C. McKay, resigned due to the possible appearance of a conflict of interest created by the activity of one of his many partners. Ms. Alexia Morrison was appointed to succeed Mr. McKay on May 29, 1986, without alteration of the Division's original jurisdictional order.

3. The relevant provisions of 18 U.S.C. § 1505 provide:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede ... the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—.
> Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

4. 18 U.S.C. § 1001 provides:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

5. 28 U.S.C. § 594(e) provides:

> A[n] independent counsel may ask the Attorney General or the division of the court to refer matters related to the independent counsel's prosecutorial jurisdiction. A[n] independent counsel may accept referral of a matter by the Attorney General, if the matter relates to a matter within such independent counsel's prosecutorial jurisdiction as established by the division of the court. If such a referral is accepted, the independent counsel shall notify the division of the court.

Counsel concluded in her application to the Attorney General that:

> no reasonable, fair, impartial and complete investigation can be conducted without examining the conduct of Mr. Schmults and Ms. Dinkins.

Independent Counsel letter at 3. The Independent Counsel stated that this conclusion was rooted in the following:

> (1) standing in isolation, as framed by [the Attorney General's] report, Mr. Olson's testimony of March 10, 1983, probably does not constitute a prosecutable violation of any federal criminal law, based on my present understanding of the evidence;
>
> (2) Mr. Olson's testimony cannot properly be viewed in such isolation, because there are at a minimum "reasonable grounds to believe that further investigation ... is warranted" *with respect to whether Mr. Olson's testimony was part of a larger, concerted plan, including Mr. Schmults, Ms. Dinkins, or others, to obstruct or impede the Committee's investigation into the Department's discharge of its responsibilities in the EPA documents dispute, possibly in violation of federal criminal law;*
>
> (3) wholly apart from any participation by Mr. Olson in a scheme to obstruct or impede the Committee's investigation, there are at a minimum "reasonable grounds to believe that further investigation ... is warranted" with respect to the conduct of Mr. Schmults and Ms. Dinkins, whose active and apparently admitted roles in the withholding of documents from the Committee seem to merit further scrutiny at least as much as Mr. Olson's testimony at the very threshold of the inquiry; and
>
> (4) my inquiry has turned up new information which justifies referral to me of the allegations as to Mr. Schmults and Ms. Dinkins.
>
> It is, therefore, necessary that I request, pursuant to 28 U.S.C. § 594(e) and for the reasons set out below, that you

> refer to me, as matters related to my present jurisdiction over specific aspects of Mr. Olson's March 10, 1983 testimony, the allegations made against *Mr. Schmults and Ms. Dinkins in the Committee Report, as well as the investigation, which is now being conducted by Public Integrity, of possible perjury charges against Robert M. Perry, EPA's General Counsel during the inter-branch controversy over the Superfund documents. I also request that you refrain from personal consideration of the requests made herein on grounds explained below.*

*Id.* at 3–4 (emphasis added).

Deputy Attorney General Burns, in a letter dated December 17, 1986 ("Burns letter"), informed the Independent Counsel that the Attorney General had, as authorized by 28 U.S.C. § 594(e), referred to the Independent Counsel the Department's ongoing investigation of Robert M. Perry (not a person covered by the Independent Counsel provisions of the Ethics in Government Act). The Attorney General had, however, denied granting the Independent Counsel authority to investigate Schmults or Dinkins. Deputy Attorney General Burns' letter emphasized that the Attorney General had already determined there were no reasonable grounds warranting further investigation or prosecution of the allegations against Schmults and Dinkins. In addition, the letter stated that although the Independent Counsel claimed that "newly discovered" evidence (not available to the Justice Department at the time of its April 10, 1986, report to the Division) warranted further investigation, the Attorney General either had already considered the evidence when he reported to the Division on April 10, 1986, or had considered the Independent Counsel's request for referral and determined that the evidence would not "alter [his] conclusion." Burns Letter at 3.

 The Independent Counsel thereafter applied to this Division for referral of the allegations against Schmults and Dinkins on the ground that they were "related

matters" under 28 U.S.C. § 594(e),[6] and that the Division had authority to refer them for investigation.

## II

### *The Independent Counsel Provisions of the Ethics in Government Act*

Before addressing the Independent Counsel's request, we discuss briefly the independent counsel provisions of the Ethics in Government Act and their historical background.

### A.

### *Historical Background of the Independent Counsel Provisions*

The Ethics in Government Act of 1978, Pub.L. No. 95–521, 92 Stat. 1824, as amended Pub.L. No. 97–409, 96 Stat. 2039 (1982), provides *inter alia* for the appointment of an independent counsel to investigate and prosecute (1) certain designated high-ranking government officials, and (2) other persons if the Attorney General determines that their investigation by the Attorney General or other officer of the Department may result in a personal, financial, or political conflict of interest. 28 U.S.C. § 591 *et seq.* The statute is designed to ensure that violations of federal criminal law by high-ranking government officials (particularly those who are of the same party as the Administration in power) will be fairly and impartially investigated and prosecuted.

The need for a special counsel who is to some extent independent of the Justice Department and free of the conflicts of interest that exist when an Administration investigates the alleged wrongdoing of its own high officials has been demonstrated several times this century.

### (1) *Teapot Dome Scandal*

During the Teapot Dome scandal of the Harding Administration, Congress found

**6.** In addition to arguing that the Attorney General's determination pursuant to § 592(b) does not limit the Division's authority under § 594(e) to refer to the Independent Counsel the allegations against Schmults and Dinkins, the Independent Counsel charges that the Attorney General's determination under 592(b) was tainted because he "applied an erroneous standard in concluding that no further scrutiny by an independent counsel of the allegations against Schmults and Dinkins was warranted" and "made his determination under the disability of at least an apparent—if not actual—conflict of interest which should have led to his recusal." Independent Counsel Application at 20. The most specific fact relied upon to support the Independent Counsel's charge is that Meese, when Counselor to the President, had expressed opposition to a Presidential pardon for former EPA Administrator Anne Gorsuch Burford. *Id.* at 37–38. This action, however, does not demonstrate any conflict of interest that would disqualify the Attorney General from evaluating the Schmults and Dinkins matters.

The Independent Counsel also urges that the Attorney General should have automatically forwarded to the Division the allegations contained in the House Committee Report, because the Attorney General did not comply with the ninety-day limitation imposed by § 592(c)(1). Independent Counsel Application at 3 n. 7.

Section 592(c)(1) provides in part:

if ninety days elapse from the receipt of the information without a determination by the Attorney General that there are no reasonable grounds to believe that further investigation or prosecution is warranted, then the Attorney General shall apply to the division of the court for the appointment of a[n] independent counsel.

The Department received the extensive Committee Report on December 12, 1985. Based on the results of the review of the Report conducted by Department attorneys, the Attorney General determined on January 10, 1986, that a preliminary investigation was warranted as to the allegations against Olson, Schmults, and Dinkins. This action was expeditious. The Attorney General's Report to the Division was filed on April 10, 1986.

Section 592(a)(1) compels the conclusion that the Attorney General's Report was timely filed. Section 592(a)(1) provides in part:

Upon receiving information that the Attorney General determines is sufficient to constitute grounds to investigate that any person covered by the Act has engaged in conduct described in subsection (a) or (c) of section 591 of this title, the Attorney General shall conduct, for a period not to exceed ninety days, such preliminary investigation of the matter as the Attorney General deems appropriate.

We agree with the Department that "some period of time is often required to ... determin[e] whether the information is sufficient to trigger even a preliminary investigation [and thus] the Department must be afforded a reasonable period of time to make that determination before the 90–day period for the preliminary investigation begins to run." Department Response at 27 n. 14. In our opinion, thirty days is not an unreasonable period of time to properly evaluate a 3,000 page investigatory report.

normal federal prosecution authority to be flawed [7] and deemed it necessary after investigating the leases of certain naval oil reserves to pass a special act appropriating money:

> to be expended by the President for the purpose of employing the necessary attorneys and agents ... in instituting and carrying on any suits or other proceedings, either civil or criminal, which he may cause to be instituted or which may . be instituted, or to take any other steps deemed necessary to be taken in relation to the cancellation of any leases on oil lands in former naval reserves, *in the prosecution of any person or persons guilty of any infraction of the laws of the United States in connection with said leases* or in any other measures which he may take to protect the interests of the United States and the people thereof in connection therewith. *Any counsel employed by the President under the authority of this resolution shall be appointed by, and with the advice and consent of the Senate and shall have full power and authority to carry on said proceedings, any law to· the contrary notwithstanding.*

H.J.Res. 160, 43 Stat. 16 (1924) (emphasis added).

Pursuant to this statutory authority, former Senator Atlee Pomerene of Ohio was appointed by President Coolidge and on February 16, 1924, confirmed by the Senate as "Special Counsel to have charge and control of the prosecution ..." 68 Cong. Rec. 2566 (1924). Mr. Owen J. Roberts, a private attorney from Philadelphia and later an Associate Justice of the Supreme Court, was subsequently appointed by the President and confirmed by the Senate to assist Senator Pomerene in the prosecution of the "oil cases." These lawyers then conducted the "oil cases" including the criminal prosecution of the former Secretary of the Interior, Albert B. Fall. *See United States v. Fall*, 10 F.2d 648 (D.C.Cir. 1925). Secretary Fall was convicted of bribery and, being a sick man, was sen-

tenced to one year in prison and fined $100,000. *See Fall v. United States*, 49 F.2d 506 (D.C.Cir.1931). Henry F. Sinclair and Edward L. Doheny were acquitted of bribery in obtaining their oil leases, but Sinclair was sentenced to nine months in prison and a $1,000 fine for contempt of court. The oil leases were cancelled.

(2) *Corruption in the Truman Administration*

During the last years of the Truman Administration, Senator John J. Williams of Delaware on numerous occasions on the Senate floor exposed widespread corruption throughout the nation in the handling of tax evasion cases. In 1951, more than one hundred and fifty Bureau of Internal Revenue officials from all over the country were discharged or forced to resign. The Assistant Attorney General of the Tax Division of the Department of Justice, T. Lamar Caudle, was forced to resign, N.Y. Times, Nov. 20, 1951, but was not prosecuted during the Truman Administration. Daniel A. Bolich, the Assistant Commissioner of Internal Revenue, also resigned. *Id.* No area of the nation seemed to be immune.

Acting under this public pressure, Attorney General J. Howard McGrath on February 1, 1952, appointed former President of the New York City Council Newbold Morris, a highly respected associate of former New York Mayor Fiorello La Guardia, to lead an investigation into the alleged corruption throughout the federal government. Morris was designated *Special Assistant to the Attorney General.* At the time of Mr. Morris' appointment, Senator Taft complained that the investigation should be taken out of Department of Justice jurisdiction: "The President should ask Congress for a law to set up an independent agency to conduct the investigation." N.Y. Times, Feb. 3, 1952. Mr. Morris, replying to Senator Taft's suggestion stated:

> I'm not under the Department of Justice. I'm completely independent. There are no strings attached. It is entirely nonpolitical. I'm designated as a special assist-

---

**7.** Public confidence was lacking in Attorney General Harry Daugherty. In matters unrelated to Teapot Dome, he was indicted and acquitted of conspiracy involving violations of the prohibition statutes and graft in the Veteran's Administration.

ant attorney general, but I'm even going to investigate the Department of Justice itself. *Id.*

Senator Taft's reservations were subsequently borne out by the firing of Mr. Morris on April 3, 1952, by Attorney General J. Howard McGrath shortly after Special Assistant Attorney General Morris, as one of the first acts of his investigation, sent McGrath a questionnaire on his personal finances and *requested access to McGrath's Attorney General files,* telephone records, engagement book, diary, and other documents. President Truman immediately fired Attorney General McGrath. N.Y. Times, Apr. 4, 1952.[8] Morris told the Senate Subcommittee on April 10th that his investigation stalled when "it moved into the Attorney General's office." *Id.* During the remainder of the Truman Administration, no special counsel was appointed to succeed Morris to continue the investigation of government corruption. However, during the Eisenhower Administration, the Criminal Division of the Department of Justice under Assistant Attorney General Warren Olney prosecuted and obtained key bribery convictions of T. Lamar Caudle, the former Assistant Attorney General in charge of the Tax Division, and Matthew J. Connelly, Truman's Appointments Secretary. Both convictions were affirmed on appeal. *Connelly and Caudle v. United States,* 249 F.2d 576 (8th Cir. 1957), *cert. denied,* 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716 (1958). Also, John D. Nunan, Jr., former Commissioner of Internal Revenue, was indicted and convicted of tax evasion of $91,086.00 on June 29, 1954.

### (3) *Watergate Scandal*

During the Watergate scandal of the Nixon Administration, Attorney General Richard Kleindienst determined, shortly after taking office in 1973, that there was the appearance of conflicts of interest requir-

ing his resignation. His voluntary resignation letter stated:

persons with whom I have had close personal and professional associations could be involved in conduct violative of the laws of the United States. Fair and impartial enforcement of the law requires that a person who has not had such intimate relationships be the Attorney General of the United States.

9 Weekly Comp.Pres.Doc. 431–32 (May 5, 1973). The Honorable Elliot Richardson was appointed Attorney General and a special prosecutor's office was established on May 25, 1973.[9] Professor Archibald Cox was then appointed by President Nixon as special prosecutor to lead the Watergate investigations. When Cox threatened to secure a judicial ruling that President Nixon was violating the order of the United States Court of Appeals for the District of Columbia Circuit to deliver certain presidential tapes to Chief Judge Sirica of the United States District Court, the President ordered him fired. The Attorney General refused to execute the President's order and resigned. Immediately thereafter the Deputy Attorney General was fired for the same reason. Cox was then discharged as special prosecutor by the Solicitor General, in his capacity as Acting Attorney General. The President also abolished the special prosecutor's office; the Watergate investigations were transferred back to the Department of Justice. A few days later President Nixon reversed his decision to abolish the special prosecutor's office and announced that a new special prosecutor would be named. Acting Attorney General Bork, by formal order, established "The Office of Watergate Special Prosecution Force." 38 Fed.Reg. 30738, 32805 (1973). Shortly thereafter, Leon Jaworski, a private attorney from Houston, Texas, was appointed by Acting Attorney General Bork to be the new Watergate Special Prosecutor. Jaworski continued to act in

---

**8.** Thus it was incorrect for Assistant Attorney General John R. Bolton at the March 19, 1987, hearing of the Senate Governmental Affairs Subcommittee to testify with respect to the firing of a special prosecutor: "It happened only once before [Watergate] ..." and the President "paid a price for it." Wash.Post, Mar. 20, 1987,

at A15, col. 1. As shown above, a special counsel was fired in 1952 and the President did not "pay a price for it."

**9.** 38 Fed.Reg. 14688, and amendments, 18877, 21404 (1973).

that capacity until a number of convictions were obtained and most of the principal cases were disposed of. The vacancy in the office of Attorney General was not filled until Congress passed a special act to authorize the appointment of Senator William B. Saxbe. Pub.L. No. 93–178, 87 Stat. 697 (1973). The special act was necessary in light of his prior vote to increase the salary of the office which would otherwise have disqualified him under art. I, § 6, cl. 2 of the Constitution.

Thus, fifty years of the nation's history involving the Teapot Dome, Truman Administration, and Watergate scandals, has demonstrated a generally recognized inability of the Department of Justice and the Attorney General to function impartially with full public confidence in investigating criminal wrongdoing of high-ranking government officials of the same political party. In each of these events, extraordinary steps were deemed necessary to ensure fair investigation and in each instance, special prosecutors were appointed. The examples of the firings of special prosecutors Morris (1952) and Cox (1973), and the fact that Congress found it necessary to pass a special act requiring the appointment of special counsel outside government in the Teapot Dome cases (1924), and the act for Senator Saxbe in 1973, made it obvious to Congress that if special prosecution counsel were *necessary* in the future, such counsel would have to enjoy some measure of independence from the Executive Branch. Accordingly, Congress in 1978, acting to regularize the manner of handling such major conflict of interest problems, enacted the Special Prosecutor provisions of the Ethics in Government Act.

(4) *Application of the Independent Counsel Provisions: The Iran Weapons Sale and the Alleged Diversion of Funds*

The best evidence that the independent counsel provisions are "necessary" and reasonable lies in their application to the current investigation into the sale of weapons to Iran and the alleged diversion of the funds to the Contra rebels.

In late 1986 there was considerable political discussion about American hostages held in the Middle East and in the provision of materiel and financial aid to the insurgents in Nicaragua. A number of letters were sent from congressional committees to the Attorney General but none generated any request for the appointment of an Independent Counsel. Then suddenly out of the blue, a Middle East newspaper reported that the United States had been involved in the sale of arms to Iran. This report led Attorney General Edwin Meese III to an immediate investigation. A few days later he called a very significant press conference in which he stated there was a strong possibility that some of the proceeds from the Iran arms sale *had been diverted to the Contras.* The announcement shocked the nation. Then in an act which has had no parallel in the history of the Special Prosecutor (Independent Counsel) statute, the Attorney General *voluntarily* requested (and President Reagan publicly supported his request) that this Division appoint an Independent Counsel with *the broadest investigatory powers ever requested under the Act.* The violation of *every* federal criminal law was to be investigated. Only one person, Lieutenant Colonel Oliver L. North, U.S. Marine Corps, was designated as a subject of the investigation, and this, not because he was a high government official but because with respect to him the Attorney General had a "personal, financial, or political *conflict of interest.*" 28 U.S.C. § 591(c) (emphasis added). The Attorney General then added *every* government official and every *other* person "acting in concert with Lieutenant Colonel North or with any other United States Government official, whether or not covered by the Independent Counsel Provisions of the Ethics in Government Act … in connection with the sale or shipment of military arms to Iran and the *transfer or diversion* [without limitation] of funds realized in connection with such sale or shipment." *In re Oliver L. North, et al.,* D.C. Cir., Division No. 86–6 (1986) (emphasis added). In response to this request, the Division appointed the Honorable Lawrence E. Walsh as Independent Counsel and or-

dered the broadest investigation ever ordered by the Division.

The *voluntary* action of the Attorney General, with the President's publicly voiced support, emphasizes that the statute authorizing such investigation is "necessary and proper" whenever a conflict of interest exists in the narrow circumstances covered by the Act.

### B.

*Constitutional Authority for the Independent Counsel Provisions*

(1) *The Authority to Create the Office of Independent Counsel*

■ The statute authorizing the court to appoint independent counsel to prosecute violations of the criminal law involving high government officials is grounded in the "necessary and proper" clause and the Article II appointments clause of the Constitution. It is as fully consistent with the separation of powers doctrine of the Constitution to which we briefly allude as it is a commonplace that the Constitution does not "contemplate[ ] total separation of each of the three essential branches of Government." *Buckley v. Valeo,* 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976). *See Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, concurring) (the Constitution ... contemplates that practise will integrate the dispersed powers into a workable government); *United States v. Nixon,* 418 U.S. 683, 707, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974) ("In designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence."); *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977) (noting that "the Court [has] squarely rejected the argument that the Constitution contemplates a complete division of authority between the three branches").

■ In authorizing by statute the appointment of independent counsel, Congress acted pursuant to its constitutional authority to create "by law" inferior officers and vest their appointment in the courts of law:

"[For] all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law ... [Congress] may by Law vest the Appointment of such inferior Officers, as [Congress] think *proper,* ... in the Courts of Law."

U.S. Const. art. II, § 2, cl. 2. It is noteworthy that this clear grant of authority to Congress to establish other officers "by law" and to provide "by law" for their appointment by "courts of law" is found in Article II—that part of the Constitution devoted to the Executive Department. The responsibility imposed upon Congress by Article II empowers it to enact laws to guard against *the evils of massive conflicts of interest involved in the enforcement of federal criminal law against the highest officials of government* and to vest in the courts the appointment of inferior officers to carry out this responsibility. Such counsel serve in the Executive Department and are constitutionally entitled to the independence that the statute provides. *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935); *Wiener v. United States,* 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958). Since 1863 the courts have been authorized by statute to fill temporary vacancies in the office of United States Attorneys (formerly District Attorneys).[10] The appointment by the Division of an independent counsel is tantamount to a court filling a vacancy created by adverse interest. For example, in *United States v. Morris,* 23 U.S. (10 Wheat.) 246, 6 L.Ed. 314 (1825), Daniel Webster argued in a condemnation case brought by court-appointed counsel in the name of the United States when the U.S. District Attorney refused to act: "The

**10.** *See* Act of March 3, 1863, 12 Stat. 768; Rev. Stat. § 793 at 149 (1878); 28 U.S.C. § 546 (1982) *as amended by* Pub.L. No. 99–646 § 69(d), 100 Stat. 3592, 3616 (1986).

discretionary power exercised by the court below, in this instance [appointing counsel], was essential to the administration of justice, whenever the district-attorney refuses to act, *or is interested,* or in case of his death." *Id.* at 274. The court decided the case without commenting on the propriety of the appointment, but one judge expressed "surprise." *Id.,* 300.

Our history, as above outlined, has thus demonstrated that it is *"necessary"* when high government officials are being investigated for criminal wrongdoing by officials of their own party, and that is the usual situation, that the Congress to the extent it thinks *"proper"* "may by Law vest the Appointment of ... inferior Officers ... in the Courts of Law." In dealing with this problem a page of history is worth a ton of theory. The independent counsel provisions are tailor-made to meet all the requirements envisioned by the Constitution. And the Independent Counsel is clearly an "inferior officer"—he is appointed for a single task to serve for a temporary limited period.

If there were any doubt about the validity of Congress acting as it has to deal with the conflict of interest problems, which are at the heart of the independent counsel provisions, it is answered by the power set forth in the "Necessary and Proper" clause. This provision of the Constitution provides that:

> The Congress shall have Power * * * To make all Laws which shall be *necessary and proper* for carrying into Execution the foregoing Powers, and all other Powers vested by the Constitution in the Government of the United States, or in any Department or Officer thereof.

U.S. Const. art. I, § 8, cl. 18 (emphasis added). The constitutional authority of Congress to vest appointment of inferior officers in the courts of law, conjoined with its power to enact laws that are "necessary and proper," "gives Congress a share in the responsibilities lodged in other departments." E. Corwin, *The Constitution of*

the United States—Analysis and Interpretation 358 (U.S. Govt. Printing Office 1972). Thus, with the constitutional authority to establish offices to be filled by inferior officers in the Executive Department and to vest the appointment of inferior officers in "Courts of Law," the Congress is authorized to enact the laws necessary to carry into execution such powers. As Chief Justice Marshall cogently remarked in *McCulloch v. Maryland,* 4 Wheat. (17 U.S.) 316, 420, 4 L.Ed. 579 (1819):

> Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional.

*Id.* The Independent Counsel statute meets all these requirements.

(2) *The Exercise of Power by the Attorney General in the Independent Counsel Scheme*

■ The minimal powers conferred on Independent Counsel do not by any means constitute an assumption of the constitutional field of action of the Executive Branch in enforcing the criminal law. The highly limited duties of the Independent Counsel are "fixed according to sense and the inherent necessities of the governmental [problem]." See *Hampton & Co. v. United States,* 276 U.S. 394, 405–406, 48 S.Ct. 348, 350–351, 72 L.Ed. 624 (1928). The provision of the Constitution providing that: "[The President] ... shall take care that the laws be faithfully executed." U.S. Const. art. II, § 3, does not require the President (or his delegate) to *"execute the laws."* The President's responsibility may be satisfied by Congress entrusting the power of execution to some other officer while the President's obligation would be satisfied by the right of the President (or his delegate) to remove the individual officer for impropriety, which may be done here.[11] *Kendall v. United States ex rel.*

---

**11.** 28 U.S.C. § 596(a)(1) provides:

A[n] independent counsel appointed under this chapter may be removed from office, other than by impeachment and conviction, only by the personal action of the Attorney General and only for good cause, physical

*Stokes,* 12 Pet. (37 U.S.) 524, 9 L.Ed. 1181 (1838); *see also, The Jewels of the Princess of Orange,* 2 Opin.A.G. 482 (1832). A review of the Independent Counsel provisions of the Ethics in Government Act § 591 *et seq.,* discloses that broad power and authority of the Attorney General are closely interwoven into the statutory scheme.

(a) The Attorney General conducts the investigation and determines whether the information is sufficient to constitute grounds to investigate that any person covered by the Act has committed a violation of any major "federal criminal law." § 591(a).

(b) The Attorney General also determines whether the investigation of other persons by the Attorney General or other officer of the Department of Justice may result in a personal, financial, or political conflict of interest. § 591(c).

(c) Even after the Attorney General determines that the evidence is sufficient to constitute grounds to investigate, he has discretion to conduct "such preliminary investigation of the matter as [he] ... deems appropriate." § 592(a)(1).

(d) If the Attorney General upon completion of the preliminary investigation finds there are no reasonable grounds to believe that further investigation or prosecution is warranted, he notifies the Division of the Court and his decision is final. Thereafter the Division of the Court shall have *"no power to appoint an independent counsel."* § 592(b)(1).

(e) If the Attorney General upon completion of the preliminary investigation finds reasonable grounds to believe that further investigation or prosecution is warranted, he then applies to the Division of the Court for the appointment of an independent counsel. He merely "compl[ies] with the written or other established policies of the Department of Justice with respect to the enforcement of criminal laws." § 592(c)(1).

(f) Even if the Attorney General has initially found that an independent counsel is not warranted, he may still, on the basis of additional information, apply for appointment of an independent counsel. § 522(c)(2).

(g) The Attorney General may also set forth in an application for an independent counsel sufficient information to assist the Division in selecting an independent counsel and in defining counsel's prosecutorial jurisdiction. This gives the Attorney General the power to suggest the type of independent counsel that is necessary and the nature and extent of the jurisdiction that should be set forth in the Division's order. § 592(d)(1).

(h) The Attorney General, in his discretion, may request the independent counsel to accept referral of a matter that relates to the independent counsel's prosecutorial jurisdiction. § 592(e).

(i) The Attorney General's determination under § 592(c) to apply to the Division of the Court for the appointment of an independent counsel *is not reviewable in any court.* § 592(f).

(j) The Attorney General may request the Division of the Court to disclose the identity and prosecutorial jurisdiction of such independent counsel as would be in the best interests of justice. § 593(b).

(k) The Attorney General may request the Division of the Court to expand the prosecutorial jurisdiction of an existing independent counsel. § 593(c).

(*l*) Upon showing of good cause by the Attorney General, the Division of the Court may grant an extension of the preliminary investigation conducted pursuant to § 592(a) for a period not to exceed 60 days. § 593(f).

(m) The Attorney General's authority to exercise direction and control of those matters that specifically require the Attorney General's personal action under § 2516 of Title 18 (Authorization for interception of wire or oral communications) is not affected. § 594(a).

(n) The Department of Justice has discretion to assist the independent counsel at his request. This may include access to any records, files, or any other materi-

---

disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties.

als relevant to the matters within such independent counsel's prosecutorial jurisdiction and the use of the resources and personnel necessary to perform such duties of the independent counsel. § 594(d).

(o) The Attorney General may, at the request of the independent counsel, refer a matter related to the independent counsel's prosecutorial jurisdiction. § 594(e).

(p) An independent counsel, except where not possible, is required to comply with the written or other established policies of the Department of Justice respecting the enforcement of the criminal laws. § 594(f).

(q) An independent counsel may dismiss matters within his prosecutorial jurisdiction at any time prior to prosecution only upon compliance with the written or other established policies of the Department of Justice with respect to the enforcement of criminal laws. § 594(g).

(r) The majority and minority members of the Judiciary Committees of Congress separately may request in writing that the Attorney General apply for the appointment of an independent counsel. If no such application is made, the Attorney General notifies the respective committee members why such application was not made. § 595(e).

(s) The Attorney General may by "personal action" remove from office an independent counsel "only for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties." § 596(a)(1).

(t) The Division of the Court upon suggestion of the Attorney General may terminate an office of independent counsel at any time, on the ground that the investigation of all matters within the prosecutorial jurisdiction of the independent counsel or accepted by such independent counsel under § 594(e), and any resulting prosecutions, have been completed or so substantially completed that it would be appropriate for the Department of Justice to complete such investigations and prosecutions. § 596(b)(2).

(u) Whenever an independent counsel is proceeding under a jurisdictional order, he may agree in writing that such investigation or proceedings may be continued by the Department of Justice. § 597(a).

(v) The Attorney General or the Solicitor General may make a presentation as *amicus curiae* to any court as to issues of law raised by any case or proceeding in which an independent counsel participates in an official capacity or in any appeal of such case or proceeding. § 597(b).

The analysis of the foregoing extracts makes it clear that Congress did not provide for a substantive intrusion by independent counsel into the Executive Department such as was found to exist in *Bowsher v. Synar*, —— U.S. ——, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986).

Upon enactment of the Judiciary Act of 1789, 1 Stat. 73, §§ 2, 35 (1789), the supervision of district attorneys came not from the Attorney General but from the Secretary of State and it remained there throughout the Federalist period. L. White, *The Federalists*, 406–11 (1948). The Attorney General was thought of as the legal advisor to the President and department heads and as an agent to whom Congress might turn for advice. It was a part-time job and the government was merely one of his clients for which he was paid half the salary of department heads. He was expected to pursue private legal work. *Id.* at 164. The District Attorneys acted in the Department of State and contacts between the two were largely fortuitous. Apart from cases of exceptional importance and difficulty, the District Attorneys operated largely on their own responsibility as matters developed within their respective districts. On occasion they employed "special counsel." *Id.* at 406–411. It was not until the Act of August 2, 1861, c. 37, 12 Stat. 285, that the "general superintendence and direction" of District Attorneys was placed with the Attorney General. This history indicates that the authority and powers of District Attorneys (now United States Attorneys) and the Attorney General are largely governed by statute.

## III

*Application of the Statutory Provisions*

The instant dispute between the Independent Counsel and the Department of Justice concerns only two provisions of the independent counsel statutory scheme. The relevant statutory language provides:

§ 592(b)(1) If the Attorney General, upon completion of the preliminary investigation, finds that there are no reasonable grounds to believe that further investigation or prosecution is warranted, the Attorney General shall so notify the division of the court specified in section 593(a) of this title, and *the division of the court shall have no power to appoint a[n] independent counsel.* (Emphasis added).

\*　　\*　　\*　　\*　　\*　　\*

§ 594(e) A[n] independent counsel may ask the Attorney General or the division of the court to refer matters related to the independent counsel's prosecutorial jurisdiction.

■ We agree with the Department of Justice that "Section 594(e) cannot be read, as the Independent Counsel suggests, to give the Division the authority to refer allegations to the Independent Counsel when the Attorney General has specifically determined, under § 592(b)(1) that those allegations should not be pursued." Department of Justice Response at 5. The provisions of §§ 592(b)(1) and 594(e) must be read together and not in isolation. It would be highly unreasonable to interpret these statutory provisions either as requiring the Attorney General, or as authorizing the division of the court, to refer the investigation of the conduct of two officials to an independent counsel's investigatory and prosecutorial jurisdiction under § 594(c) when the Attorney General has *twice* determined with respect to the conduct of said two individuals, in accordance with his statutory authority under § 592(b)(1), that there were "no reasonable grounds to believe that further investigation or prosecution is warranted." That is in effect what the court would accomplish if the order appointing independent counsel to investi-

gate Olson were amended by the court, in effect, to appoint the same counsel to investigate Schmults and Dinkins as separate subjects.

To suggest that the division of the court can bring about this result acting alone, upon the sole request of the independent counsel, would undercut the plain intent of § 592(b)(1) and permit the accomplishment by indirect means of a result that the statute prohibits being accomplished by direct means. Section 594(e) cannot be read to achieve such an unreasonable result.

The Independent Counsel, while urging "that the allegations against Schmults and Dinkins, standing alone, warrant further investigation," Independent Counsel Application at 34, also maintains that "the known facts raise a reasonable suspicion that Olson, Schmults, and Dinkins may have acted together to frustrate the Committee's inquiry." Independent Counsel Reply at 11. *See also* Independent Counsel Application at 34 (noting "possibility that the actions of Schmults, Dinkins, and Olson were taken pursuant to a concert of action involving some or all of them and designed to obstruct the Committee's inquiry").

■ Our current Order appointing the Independent Counsel authorizes her:

to investigate and pursue the question whether testimony of Mr. Theodore Olson and his revision of testimony on March 10, 1983 violated either 18 U.S.C. § 1505 or § 1001, *or any other provision of federal law.* [The Order also further grants] jurisdiction to investigate any other *allegation or evidence of violation of any Federal criminal law* by Theodore Olson developed during investigations, by the Independent Counsel, referred to above, and connected with or arising out of that investigation and the Independent Counsel shall have jurisdiction to prosecute for any such violation.

Order of April 23, 1986 at 1–2 (emphasis added). Implicit in this jurisdictional grant to investigate possible connected violations of federal criminal law is the authority to investigate allegations and evidence that Theodore Olson was engaged in an unlawful conspiracy with others or that he aided

and abetted any criminal offense connected to the investigation ordered. To the extent that the Independent Counsel wishes to investigate "whether Mr. Olson's testimony was part of a larger, concerted plan, including Mr. Schmults, Ms. Dinkins, *or others*, to obstruct or impede the Committee's investigation into the Department's discharge of its responsibility in the EPA documents dispute, possibly in violation of federal law," Independent Counsel letter at 3, the current order confers that power upon the Independent Counsel. The Attorney General's decision not to request appointment of an independent counsel with respect to Schmults and Dinkins, or to refer certain allegations against them to the Independent Counsel investigating Olson, simply cannot impinge upon the Independent Counsel's current jurisdiction, as stated in our April 23, 1986, Order, to investigate "any other allegation or evidence of violation of any Federal criminal law by ... Olson and connected with or arising out of that investigation."

It should be pointed out, however, that while the Independent Counsel's authority to investigate the possibility that Olson was engaged in criminal conspiracy, or aided or abetted any criminal offense, *a fortiori* encompasses the authority to investigate the actions of others involved in the possible unlawful concert of action, the current order grants the Independent Counsel jurisdiction to *prosecute* only Olson. If further investigation by the Independent Counsel turns up credible evidence of federal criminal violations by others, the Department of Justice has expressed its willingness to consider such new evidence. Burns Letter at 3. ("If you have any additional information that bears on this matter please do not hesitate to bring it to our attention. In that event, the Attorney General will, of course, consider your request in the light of any additional information available.") *See also* Report of Attorney General at 11 (noting that "independent counsel may wish to confer with the Department concerning related matters").

Thus, the Independent Counsel has jurisdiction under our current jurisdictional order to investigate whether Olson conspired with or aided or abetted *any person* (including but not limited to Schmults or Dinkins), to frustrate the inquiry of the House Committee on Energy and Commerce, in violation of federal criminal law. Also, the investigation of EPA's Perry has been transferred by the Attorney General as a related matter from the Public Integrity Section to Independent Counsel at her request. Due to the Attorney General's prior decisions closing investigation of the distinct allegations against Schmults and Dinkins, and the preclusive effect of § 592(b)(1), the Independent Counsel has continuing jurisdiction to investigate the actions of Schmults and Dinkins only insofar as they were part of a concert of action *with Olson*, in violation of federal criminal law.

## IV

### *Miscellaneous*

■ The Independent Counsel has requested the Division to publicly release the pleadings with respect to her request for jurisdiction over the alleged "related matters" discussed above and the Attorney General has agreed to such request. Schmults and Dinkins have submitted motions to intervene and have been allowed to file *amicus curiae* briefs in support of their request to withhold disclosure of the Independent Counsel's application, the response of the Department, and the reply of the Independent Counsel.

Courts have consistently held that a person challenging the authority or propriety of a criminal investigation can do so only after an indictment (if any) is returned by the grand jury. *See, e.g., Matter of Doe*, 546 F.2d 498 (2d Cir.1976); *Jett v. Castaneda*, 578 F.2d 842 (9th Cir.1978). The court therefore denies the motions to intervene and the requests to withhold disclosure, and in the best interests of justice grants leave of court to publicly release the application of the Independent Counsel, the briefs of the parties on the application, and

the court's foregoing opinion in this cause.[12]

*Order Accordingly.*

## ORDER

Upon consideration of the request of counsel for Edward C. Schmults and Carol E. Dinkins to intervene in this cause and for the Court to withhold disclosure of the documents ordered unsealed by the Court's order of March 9, 1987, which was temporarily revoked by the Court's order of March 11, 1987, and the Court being fully advised in the premises, for reasons set forth in its accompanying opinion, it is hereby

ORDERED, by the Court, that the motions to intervene and the requests to withhold disclosure are hereby denied; and it is further

ORDERED, by the Court, that the motion of Independent Counsel, partially concurred in by the Attorney General, for leave of Court to unseal and publicly release:

(1) The Application of the Independent Counsel for Referral of Related Matters Pursuant to 28 U.S.C. § 594(e) and all exhibits thereto, filed January 13, 1987; (2) the Response of the Department of Justice to Application of the Independent Counsel for Referral of Related Matters Pursuant to 28 U.S.C. § 594(e), filed February 12, 1987; and (3) the Reply to Department of Justice Response to Independent Counsel's Application for Refer-

ral of Related Matters Pursuant to 28 U.S.C. § 594(e), filed February 24, 1987, is hereby granted in the best interests of justice; and it is further

ORDERED, by the Court, in the best interests of justice, that this order and the accompanying opinion of the Court are hereby authorized to be publicly released.

**12.** Prior to appointing Ms. Morrison, the Division considered whether the fact that she had eight months earlier been Chief Litigation Counsel for the Securities and Exchange Commission would disqualify her pursuant to § 593(d). That subsection provides:

The division of the court may not appoint as a[n] independent counsel any person who holds or recently held any office of profit or trust under the United States.

We noted that the legislative history of this provision indicates that:

[a] person appointed special prosecutor who formerly was an employee of the United States Government should have left the government a long enough period of time prior to being appointed a special prosecutor so that there is the reality and the appearance that such individual is totally independent from that government.

Senate Report 95–170, 95th Cong., 2d Sess., reprinted in U.S.Code Cong. & Ad.News 1978, 4216, 4282. The Senate report also states that:

No time period was specified in this section; however, the Committee felt that it would defeat the purposes of this title if, for example, someone could resign their position as United States attorney or a member of the Justice Department one day, and be appointed a special prosecutor the next.

*Id.* The Division concluded that the eight months between Ms. Morrison's departure from the SEC and her appointment as Independent Counsel in this matter was an adequate lapse of time that ensured she is "independent, both in reality and in appearance, from the President and the Attorney General." During the interval, she had been actively engaged in the private practice of law as a partner in a local law firm.